UNITED STATES of America,
Plaintiff–Appellee,

v.

Francisco SOLANO–GODINES,
Defendant–Appellant.

No. 96–10255.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1997.

Decided July 21, 1997.

Robert J. McWhirter, Assistant Federal Public Defender, Phoenix, AZ, for Defendant–Appellant.

Tim Holtzen, Assistant United States Attorney, Phoenix, AZ, for the Plaintiff–Appellee.

Before REINHARDT, HALL and THOMPSON, Circuit Judges.

## OVERVIEW

DAVID R. THOMPSON, Circuit Judge.

Francisco Solano–Godines (Solano) appeals his conviction and sentence after conditionally pleading guilty to one count of illegal reentry after deportation following a felony conviction, in violation of 8 U.S.C. § 1326(b)(1), and one count of false representation of United States citizenship, in violation of 18 U.S.C. § 911. He argues the district court erred in denying his pretrial motion to suppress statements he made at a prior civil deportation hearing because (1) he did not receive *Miranda* warnings before he made the statements, and (2) the statements were involuntary in light of the immigration judge's ability to draw an adverse inference from his silence. Solano also argues the district court erred in imposing a two-level upward adjustment in his base offense level under United States Sentencing Guideline section 3C1.1 for obstruction of justice.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm Solano's conviction but vacate his sentence and remand for resentencing.[1]

## FACTS

On December 7, 1993, almost two years before the government brought the current charges, Solano appeared at a deportation hearing and responded to questioning by the immigration judge. In these responses, Solano made statements about his place of birth, citizenship, prior convictions, and prior lawful deportations. Like other typical respondents at deportation hearings, Solano was not given a *Miranda* warning. He was deported following the deportation hearing.

About two years later, at 11:00 a.m. on December 1, 1995, Solano attempted to enter the United States through the pedestrian lanes at the San Luis Port of Entry in Arizona. He told a U.S. customs officer that he was a United States citizen and presented a birth certificate bearing the name Jose Armando Gonzales. The customs officer detected some nervousness on Solano's part and some possible irregularities on his birth certificate. He therefore escorted Solano to the secondary inspection area for further investigation.

Inside the Immigration & Naturalization Service (INS) office, INS Inspector Raymond Nagy ran a computerized criminal history check on the name and birth date written on the birth certificate Solano had presented to the customs officer. The computer record indicated that Jose Armando Gonzales had an extensive criminal history and was currently serving a life prison sentence in California for murder.

Nagy and another INS inspector, Lisa Stubbs, brought Solano into an interview room. Solano again stated that he was Jose Armando Gonzales, a U.S. citizen born in California. He showed the inspectors additional false identification documents bearing the name Jose Armando Gonzales including a California identification card and a social security card.

Stubbs informed Solano that he was under arrest and recited the *Miranda* warnings. Although Solano refused to sign the INS's waiver-of-rights form, he did not request an attorney nor did he refuse to answer questions. The inspectors obtained inked fingerprint samples from Solano and faxed these to the FBI at approximately 11:30 a.m., hoping to determine the identity of the man they had in custody.

While the inspectors waited for the results of the fingerprint comparison, they left Solano alone in an interview room. At about 3 p.m. Officer Nagy called the FBI to check on the status of the fingerprint comparison, and was told the report was not yet ready.

No one from the INS questioned Solano further until about 4 p.m., when Inspector Joe Magana came on duty. Magana entered the interview room, and after a short conversation with Solano, Solano agreed to sign the waiver-of-rights form. He signed the form using his alias, "Jose Gonzales."

Magana then left to perform other duties. He returned about an hour later and told Solano that the person he claimed to be was

---

1. In a memorandum disposition filed concurrently with this opinion, we have affirmed the district court's rulings on other issues raised in Solano's appeal.

supposed to be in prison for murder. Solano stated that he *had* been in prison for murder, but was released after the real killer, a buddy of his, was caught.

Between 6:00 p.m. and 7:00 p.m. one of the INS officers called the FBI to check on the status of the fingerprint results, and was informed that the FBI had lost Solano's fingerprint samples. The officers then faxed the FBI a new set.

At about 9:20 p.m., Inspector Luis Lemus called the California Department of Corrections to try to determine if Jose Armando Gonzales was actually in prison. After a few phone calls, he reached an officer at Pelican Bay who verified that Gonzales was in fact in custody at Pelican Bay as they spoke.

Inspectors Magana and Lemus told Solano they had verified that Jose Armando Gonzales was currently in prison at Pelican Bay. Solano then admitted his true name and that he was a citizen of Mexico, born in Acapulco. Soon after, at 10:08 p.m., the inspectors received a fax from the FBI, reporting that the fingerprint samples matched their records for Francisco Solano–Godines.

Solano was charged with illegal reentry after deportation following a felony conviction and false representation of United States citizenship. He filed a pretrial motion to suppress the statements he made two years earlier at his deportation hearing and the documentary "fruits" of those statements. The district court denied this motion. Solano then entered his conditional guilty pleas.

At sentencing, Solano objected to the presentence report's recommendation that the court upwardly adjust his base offense level for obstruction of justice under Sentencing Guideline § 3C1.1. The district court imposed the two-level adjustment and explained:

I find from the facts of the case, the defendant in fact attempted to obstruct justice in this case. He went beyond the means of the indictment in this case in merely presenting a false name. Because when confronted with the fact that the true facts were known, he did not recant. He kept up with ... this charade of false statements, and sent the government on a wild goose chase, which in fact required other investigative techniques over a 10– to 12–hour period of time, And I believe ... that he's entitled to the two point enhancement.

The district court sentenced Solano to a 32–month prison term for each count to be served concurrently, followed by three years of supervised release.

## DISCUSSION

### A. Suppression of Statements Made at Prior Civil Deportation Hearing

Solano first argues the district court erred in denying his motion to suppress statements he made at his deportation hearing two years before the current charge. The statements include responses to the immigration judge's questions as to his place of birth, his citizenship, and his prior convictions and deportations. Solano argues these statements should have been suppressed because (1) he was not given *Miranda* warnings before questioning at his deportation hearing, and (2) his statements were involuntary due to the immigration judge's ability to draw a negative inference from his silence if he had refused to answer questions at that hearing. We conclude the district court did not err in denying Solano's motion to suppress these statements.

#### 1. Miranda Warnings Not Required

Solano argues he was entitled to *Miranda* warnings during his deportation hearing because the statements he made in answer to the immigration judge's questions might have been incriminating.

■ Solano's statements were not obtained in violation of *Miranda*. *Miranda* warnings are not required before questioning in the context of a civil deportation hearing. *Trias–Hernandez v. I.N.S.*, 528 F.2d 366, 368 (9th Cir.1975). Statements made at a deportation hearing are admissible at the deportation hearing despite the absence of *Miranda* warnings. *Nai Cheng Chen v. I.N.S.*, 537 F.2d 566, 568 (1st Cir.1976). This is because deportation proceedings are not criminal prosecutions, but are civil in nature. *Id.* "[T]he full panoply of ... procedural and

substantive safeguards which are provided in a criminal proceeding are not required at a deportation hearing." *Id.* In *Trias–Hernandez,* we explained that "the substantial distinctions between a deportation proceeding and a criminal trial make *Miranda* warnings inappropriate in the deportation context." *Trias–Hernandez,* 528 F.2d at 368.

A principal purpose of the *Miranda* warnings is to permit the suspect to make an intelligent decision as to whether to answer the government agent's questions. (Citations omitted.) In deportation proceedings, however-in light of the alien's burden of proof, the requirement that the alien answer non-incriminating questions, the potential adverse consequences to the alien of remaining silent, and the fact that an alien's statement is admissible in the deportation hearing despite his lack of counsel at the preliminary interrogation-*Miranda* warnings would be not only inappropriate but could also serve to mislead the alien.

*Id.* (quoting *Chavez–Raya v. INS,* 519 F.2d 397, 402 (7th Cir.1975)). Thus, the immigration judge's questioning, without giving Solano a *Miranda* warning, did not violate *Miranda* in the context of the civil deportation proceeding.

Solano argues, however, that his unwarned statements should nevertheless have been excluded in any subsequent criminal trial. He relies upon *United States v. Alderete–Deras,* 743 F.2d 645 (9th Cir.1984). In *Alderete–Deras,* we suggested that the lack of a *Miranda* warning at a civil deportation hearing "might" render statements made during that hearing inadmissible in a subsequent criminal trial. *Id.* at 648.

■ The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As a procedural safeguard to protect this privilege against self-incrimination, the prosecution may not use any statement obtained by law enforcement officers as a result of "custodial interrogation," unless

the defendant received *Miranda* warnings prior to the interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966).

■ The test to determine whether questioning is "interrogation" within the meaning of *Miranda* is whether "under all of the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Mata–Abundiz,* 717 F.2d 1277, 1278–79 (9th Cir.1983) (quoting *United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980))). Because the immigration judge's questions were not reasonably likely to elicit an incriminating response from Solano, Solano was not interrogated within the meaning of *Miranda* at his deportation hearing.[2]

Our opinion in *Mata–Abundiz* is instructive. In that case, an INS criminal investigator questioned Mata while he was in jail on state criminal charges including possession of a firearm by an illegal alien. *Mata–Abundiz,* 717 F.2d at 1278. The INS investigator characterized his jail visit as a routine civil investigation. *Id.* During that visit, he asked Mata his citizenship and did not administer any *Miranda* warnings. *Id.* Mata responded he was a citizen of Mexico. *Id.* The investigator then went to his office and made further inquiries into Mata's immigration status. *Id.* Within three hours, he returned to the jail with a warrant for Mata's arrest. A few days later, Mata was charged with the federal offense of possession of a firearm by an illegal alien. *Id.* Mata's unwarned statement to the investigator was the only evidence presented at trial to show his alienage. *Id.*

In these circumstances, we held that the INS investigator's questioning of Mata at the jail amounted to an "interrogation" under *Miranda,* because the investigator had reason to know that his questions were likely to elicit incriminating information relating to a federal prosecution for illegal possession of a

---

**2.** Because we conclude Solano was not "interrogated" within the meaning of the *Miranda* rule, we do not reach the issues whether the immigration judge was a law enforcement officer under *Miranda* or whether Solano was in custody during the questioning.

firearm by an alien. *Id.* at 1279. We noted however:

> This does not mean that admissions obtained in civil investigations of in-custody suspects can never be used in criminal prosecutions, unless the investigator first gives warnings. The question here, as in other contexts, turns on whether there was 'interrogation' within the meaning of *Miranda.* If an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation. Not all civil questioning constitutes interrogation.

*Id.* at 1279–80.

Applying the *Mata–Abundiz* standard, Solano was not, for the purposes of the case before us, "interrogated" within the meaning of *Miranda* when the immigration judge asked him questions during his civil deportation proceeding. The immigration judge could not be expected to anticipate that two years later Solano would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime.

#### 2. *Statements Not Involuntary*

Solano argues that the statements he made at his deportation hearing were nonetheless involuntary because if he had not testified the immigration judge could have drawn adverse inferences from his silence; thus, he was forced to testify. We reject this argument.

 It is well established that in a criminal trial a judge or prosecutor may not suggest that the jury draw an adverse inference from a defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–34, 14 L.Ed.2d 106 (1965). In civil proceedings, however, the Fifth Amendment does not forbid fact finders from drawing adverse inferences against a party who refuses to testify. *Baxter v. Palmigiano,* 425 U.S. 308, 318–20, 96 S.Ct. 1551, 1557–59, 47 L.Ed.2d 810 (1976); *Lefkowitz v. Cunningham,* 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1

(1977). Deportation proceedings are civil proceedings, and in such proceedings an immigration judge may draw an adverse inference from a defendant's silence in response to questioning. *Alderete–Deras,* 743 F.2d at 647; *U.S. ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 154, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923).

Solano's predicament is no different from that of any other civil defendant. He, like all civil defendants, had to balance the benefits of not testifying against the risk that the immigration judge might draw an adverse inference from his silence. Solano chose to testify. Making this choice did not render his statements involuntary.

#### B. *Did the District Court Clearly Err in Finding that Solano Obstructed Justice Under USSG § 3C1.1?*

Solano next argues the district court erred in applying a two-level upward adjustment to his base offense level for obstruction of justice under United States Sentencing Guideline § 3C1.1.

Sentencing Guideline § 3C1.1 requires the sentencing court to apply a two-level upward adjustment in the defendant's base offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." USSG § 3C1.1.

The government argues the court properly applied its two-level enhancement under application note 3(c) in the commentary to section 3C1.1. This application note provides that the enhancement is warranted for "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." USSG § 3C1.1, comment. (n.3(c)). Solano presented a false California identification card and social security card to the INS inspectors.

Solano contends the court improperly applied the two-level enhancement because application note 4(a) in the commentary to section 3C1.1 states the enhancement is *not* warranted for "providing a false name or identification document at arrest, except

where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense." USSG § 3C1.1, comment. (n.4(a)). Solano contends that although he provided a false name and false identification documents, this conduct did not actually result in a significant hindrance to the investigation of his crimes or his prosecution.

We must first determine which of the two application notes applies here because conduct falling within the scope of application note 3(c) warrants the enhancement regardless of whether it actually resulted in a significant hindrance to the investigation or prosecution, while conduct falling within the scope of application note 4(a) does *not* warrant the enhancement unless "such conduct actually resulted in a significant hindrance."

 We conclude application note 4(a) applies rather than application note 3(c). Although these application notes appear to conflict, application note 3(c) "anticipate[s] lack of candor toward the *court*—including lack of candor in respect to a[n] . . . . investigation for the court," while application note 4(a) anticipates lack of candor toward law enforcement officers. *United States v. Magana–Guerrero*, 80 F.3d 398, 401 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 141, 136 L.Ed.2d 88 (1996) (emphasis added) (internal quotation marks omitted). *See also United States v. Benitez*, 34 F.2d 1489, 1497 n. 6 (9th Cir.1994). We have explained that

> application note 3(c) provides that attempting to produce a false document "during an official investigation or judicial proceeding" qualifies for the enhancement, even without a showing of actual obstruction. We must interpret this application note's reference to an "official investigation" narrowly, as reaching only official investigations closely associated with judicial proceedings. A broader reading would conflict with application note 4(a), which provides that giving a false identification document "at arrest" only qualifies for the enhancement if it significantly impedes an investigation.

*Magana–Guerrero*, 80 F.3d at 401 n. 5. Thus, the application notes distinguish between false statements and documents presented to

judges, magistrates, probation officers and pretrial services officers, which need not impede an investigation or prosecution to constitute an obstruction of justice, and those presented to law enforcement officers, in which circumstance some significant hindrance to an investigation or prosecution must be established. *Id.* at 401; *Benitez*, 34 F.3d at 1497 n. 6.

Here, Solano presented a false name and false identification documents only to INS inspectors. Because INS inspectors are law enforcement officers, Solano's conduct falls within the scope of application note 4(a), and outside the scope of application note 3(c). Solano's conduct includes his presentation of a false California identification card and social security card to the INS inspectors at the secondary inspection point, and his use of the alias "Gonzales" until he finally admitted his true identity more than ten hours after he was detained.

 Solano's conduct also falls within the scope of a third application note—3(g)—which provides that the obstruction of justice enhancement is warranted for "providing a materially false *statement* to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." USSG § 3C1.1, comment. (n.1) (emphasis added). Application note 3(g) applies when a defendant makes a materially false *statement* to law enforcement officers (as opposed to providing a false name and identification documents). Here, Solano made a materially false statement to the INS investigators when, after being confronted with the fact that Gonzales was in prison for murder, Solano stated that he *had* been in prison for that murder but had been released when the government arrested the real killer.

 However, under both relevant application notes—4(a) and 3(g)—Solano's false self-identification and false statement to law enforcement officers do not warrant the two level enhancement unless his conduct actually resulted in a significant hindrance to the investigation or to his prosecution. *See Magana–Guerrero*, 80 F.3d at 401; *Benitez*, 34 F.3d at 1497 n. 6; *United States v. Surasky*,

976 F.2d 242, 246 (5th Cir.1992) ("a false statement made by a defendant to law enforcement officers cannot constitute an obstruction of justice unless the statement obstructs or impedes the investigation at issue significantly"); *United States v. Manning,* 955 F.2d 770, 775 (1st Cir.1992); *United States v. Rodriguez,* 942 F.2d 899, 902 (5th Cir.1991); *United States v. Urbanek,* 930 F.2d 1512, 1515 n. 2 (10th Cir.1991). The enhancement is not warranted for merely *attempting* to hinder the investigation by use of an alias or other misstatements. *Manning,* 955 F.2d at 775 n. 5; *United States v. Moreno,* 947 F.2d 7, 11 (1st Cir.1991). "[A]ctual, significant hindrance to investigation is necessary when false aliases are given, not under oath, during the investigation." *Urbanek,* 930 F.2d at 1515 n. 2.

The First Circuit has held that using an alias and making false statements to law enforcement officers significantly hindered an investigation where it was established that "[p]rosecution resources were diverted as a result of [the defendant's] false statements at the time of his arrest, requiring the prosecution ... to proceed differently than if the false statements had not been made." *United States v. Thomas,* 86 F.3d 263, 264 (1st Cir.1996). In *Thomas,* the defendant's lie about his age to arresting officers significantly hindered the prosecution because the government had to halt its federal prosecution after it had filed documents in federal court, institute a state juvenile proceeding, and then abandon it and refile a federal action. *Id.* at 263–64.

In *United States v. Rickett,* 89 F.3d 224 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 499, 136 L.Ed.2d 391 (1996), the Fifth Circuit held that the defendant's presentation of a false driver's license significantly hindered the investigation where it caused the police to arrest an innocent individual and required the government to file a superseding indictment. *Id.* at 226–27.

In *United States v. Benitez,* we held the defendant's lies about his criminal history significantly hindered his prosecution where it was established that the government did not discover the lies until after a plea agreement had been entered and the lies affected the government's handling of the plea agreement and bail. *Benitez,* 34 F.3d at 1497. *See also United States v. McCoy,* 36 F.3d 740, 742 (8th Cir.1994); *United States v. Flores–Flores,* 5 F.3d 1365, 1369 (10th Cir. 1993).

▮ In explaining why it applied the enhancement here, the district court stated that Solano's ongoing "charade of false statements ... sent the government on a wild goose chase, which in fact required other investigative techniques over a 10– to 12–hour period of time."

The record does not support this finding. The INS inspectors employed only three "investigative techniques" before Solano confessed: (1) they ran a computerized criminal history check on the name Jose Armando Gonzales, (2) they sent fingerprint samples to the FBI, and (3) they made approximately three phone calls to determine whether Jose Armando Gonzales was actually in prison.

With regard to the computerized criminal history check on the name Jose Armando Gonzalez, this did not hinder the investigation. It was part of the investigation, and not atypical of criminal history checks the INS customarily runs on suspected illegal aliens. Taking Solano's fingerprints did not hinder the investigation, because that too was part of the routine. The FBI fingerprint report was delayed, but this was the fault of the FBI, not Solano. What the district court characterized as a "wild goose chase" that took ten hours, actually included substantial downtime caused by the FBI initially losing Solano's fingerprints and then taking several hours to fax the results to the inspectors.

Finally, Solano's story that he was Jose Armando Gonzalez and that he had been released from prison did not hinder the inspectors' investigation. To the contrary, this story seems to have prompted the inspectors to make some phone calls to the California Department of Corrections which confirmed that Jose Armando Gonzalez was still in prison and that Solano was lying about his identity. The inspectors then confronted Solano with this information, and Solano confessed shortly thereafter.

In sum, there is no evidence which supports the district court's finding that Solano significantly hindered the inspectors' investigation.[3] *See United States v. Manning,* 955 F.2d 770, 775 (1st Cir.1992) (holding the defendant did not significantly hinder the investigation where it was "unclear that the investigation would have proceeded any differently or any faster had [the defendant] simply [told the truth] at the time of his arrest."); *United States v. Robinson,* 978 F.2d 1554, 1566 (10th Cir.1992) ("Although fingerprinting, checking and cross-referencing may have been required [by the defendant's use of an alias upon arrest] we ... cannot conclude that the investigation was significantly hindered on this record.").

## CONCLUSION

The district court correctly concluded that the unwarned statements Solano made at his earlier deportation hearing were admissible in a subsequent criminal trial. The district court's finding that Solano's conduct warranted a two-level enhancement under Sentencing Guideline § 3C1.1 for obstruction of justice was clearly erroneous. Although Solano misrepresented his identity to the INS inspectors, and persisted in that misrepresentation, the record does not support a finding that this conduct actually resulted in a significant hindrance to the investigation of the charged offenses within the meaning of application note 4(a) in the commentary to section 3C1.1 of the Guidelines.

Solano's conviction is AFFIRMED. His sentence is VACATED and this case is REMANDED to the district court for resentencing in accordance with this opinion.

AFFIRMED in part; VACATED in part and REMANDED.

---

**3.** The government's reliance on *United States v. Rodriquez–Macias,* 914 F.2d 1204 (9th Cir.1990) (use of alias at time of arrest supported enhancement for obstruction of justice) is misplaced because that case was decided before application note 4(a) was added to the commentary to section 3C1.1 clarifying that the use of a false name or identification document upon arrest does not warrant the obstruction of justice enhancement unless such conduct results in a significant hindrance to the investigation. *See* USSG App. C (amend.347) (effective November 1, 1990).