**UNITED STATES of America, Plaintiff,**

v.

**7. Imran KHAN, Defendant.**

**No. 03–CR–127–B.**

United States District Court, D. Colorado.

July 12, 2004.

John F. Sullivan, III, John F. Sullivan, III, Atty. at Law, Denver, CO, William

Michael Whelan, Jr., Wm. Michael Whelan, Jr., Atty. at Law, Oakland, CA, for Defendant.

David Michael Gaouette, U.S. Attorney, United States Attorney's Office, Denver, CO, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendant Imran Khan moves to suppress inculpatory statements under the Fourth and Fifth Amendments. A hearing began on April 9, 2004, and continued twice, to May 27, and to June 28, 2004. The government opposes the motion. Having the benefit of the parties' briefs, evidence presented during the hearing, and oral argument, I grant the motion in part and deny it in part.

### I. Facts

#### A. *Interviews with Other Defendants*

The charges in this case arise from Defendant Khan's and the other alleged co-conspirator defendants' (*see* United States District Court for the District of Colorado case 03–CR–127–B) alleged scheme to arrange for and assist Khan's fraudulent entry into the United States.

Mr. Kahn's case has been severed from that of his co-defendants. Prior to 1996, Khan was a Pakistani national residing in Pakistan. On or about March 4, 1996, Defendant Abdul Qayyum, a naturalized U.S. citizen, filed an immigration visa petition (INS Form I–130) on behalf of Khan. At the time, such a petition could initiate an alien's lawful immigration to the United States. Generally, a Form I–130 petitioner must be an immediate relative of the proposed immigrant: father, mother, brother, sister, son, daughter, step-parent, or legally adoptive parent.

In Khan's petition, signed under penalty of perjury, Defendant Qayyum represented that Khan was his "child" and was not related to him by adoption. Qayyum also provided an affidavit, allegedly filed by him with the Pakistani government in 1989, wherein he represented that Khan was born "of" his "wedlock" with Naseem Ahktar on August 7, 1979. Finally, Defendant Chris Marie Warren–Qayyum's wife–also filed an affidavit (INS Form I–134) on behalf of Khan indicating that he was her stepson. Relying on Qayyum's and Warren's information and affidavits, INS officials approved Khan's petition. Eventually an immigrant visa issued to him. Using the visa, Khan traveled from Pakistan to the United States with Defendant Saima Saima, and entered the country August 19, 1997.

Khan is 24 years old, and has little formal education, but speaks a number of languages, including Punjabi, his native tongue. Khan testified that his English language ability is "50/50," and that it takes him a while to understand and speak. However, his testimony in this case, and the transcript from his March 24, 2003 deportation hearing belie this. Khan has a good grasp of the English language. He does not need an interpreter, responds quickly to questions, and articulates his thoughts well. I find that Khan is of at least average intelligence, if not higher than average. The testimony of Agents Godwin and Castro supports these conclusions.

In late 2002 and early 2003, FBI Special Agent Michael Castro and Bureau of Immigration and Customs Enforcement (BICE) Special Agent Ross Godwin interviewed Mr. Khan's co-defendants. Both agents were members of the Joint Terrorism Task Force headquartered in Denver. The agents sought to ascertain the true familial relationships of the defendants. During all but one of the interviews of the defendants other than Khan, the defen-

dants allegedly stated that Qayyum was Khan's biological father.

Nonetheless, the agents suspected the statements that Qayyum was Khan's biological father were false and that Khan was illegally in the United States. Based on information provided by Qayyum, the agents believed that Qayyum was in Germany-not Pakistan-at the time Khan was conceived. They also believed, based on an intercepted telephone call between Defendant Qayyum and another person that Qayyum acknowledged Khan had entered illegally. Finally, the agents noticed that the other defendants talked about Khan disrespectfully, which was inconsistent with the way the family members otherwise treated each other. The agents believed that this indicated Khan was not a sibling, son, or stepson of other defendants.

### B. *March 6, 2003*

On March 6, 2003, having completed interviews with the other defendants, Agents Castro and Godwin traveled to Petaluma, California, to interview Khan, who resided there at the time. The government contends-based on the testimony of both agents-that the agents hoped to interview Khan and solicit his cooperation in the investigation of the circumstances of his entry into the United States. Despite Defendant's arguments that the agents had always considered Khan the *subject* of a criminal investigation, I disagree. The evidence is clear that the agents considered Khan-at least initially on March 6, 2003–both a potential witness in an underlying terrorism investigation against Defendants Nasser, Kamran, and Rashid, and the subject of the civil immigration-violation investigation. The terrorism implications of this case have since evaporated. Agent Castro acknowledged that at the time there was confusion about how and under what authority an FBI and BICE agent working in concert in a mixed civil and criminal investigation should conduct their investigation. Agent Castro testified that the agents discussed and planned their interrogation strategy before flying to California. They specifically discussed their plan to question Khan in a purely civil context concerning an immigration violation. But as I explain below, the agents knew before traveling to Petaluma that Khan was a *potential* subject for criminal prosecution.

At some time between 8:30 a.m. and 9:00 a.m. on March 6, Agents Castro and Godwin knocked on Khan's apartment door. When Khan answered, the agents told Khan they had run into his parked car with their car and would like to pay for the damage. This was a ruse calculated to lure Khan out of the apartment. When Khan stepped outside, Agent Godwin identified himself as a federal immigration agent, and Agent Castro either as his partner or another agent. Defendant Khan testified that the agents identified themselves as "FBI." The testimony differs, and I find the agents' testimony on this issue more credible.

Agent Godwin asked Khan if he would be willing to discuss his immigration status. Khan agreed to do so, invited the agents into his apartment, and offered them coffee. Khan woke up around the time the agents arrived, and still wore the exercise clothes in which he had slept. Shortly after answering some routine background questions, Khan told the agents he wanted to leave his apartment in case his roommate returned. Either Agent Godwin or Khan suggested the three continue their conversation in the agents' rental car. After parking the car somewhere behind Khan's apartment, they continued the conversation.

While in the car, Agent Castro sat in the front seat, and Agent Godwin sat in the back seat along with Khan. During the

next 90 minutes to two hours, the agents intermittently questioned Khan. They focused on whether he was the biological son of Qayyum. In response to this inquiry, Khan insisted that Qayyum was his father. When the agents questioned his veracity, Khan became excited and upset, and stated in substance that the agents could not prove that Qayyum was not his father.

After approximately two hours, Agent Godwin telephoned his supervisors at BICE in Denver to discuss whether sufficient grounds existed for a warrantless civil immigration arrest of Khan. After doing so, and believing that he had an adequate basis for the arrest, Godwin arrested Khan for civil deportation proceedings. Castro searched Khan by placing him against the car, spreading his legs by kicking them with his feet, pulling his waistband away from his body, and lifting his shirt. These are common techniques used to search a suspect for weapons or contraband. The agents then placed handcuffs, a belly chain, and leg irons on Khan. He remained in these restraints until his arrival in Colorado. At some point, the agents informed Khan they were taking him to Denver.

The agents then transported Khan in his restraints to the Hayward Airport, approximately one to two hours' distance by car, where a 6–to–8–seat FBI airplane awaited. On the way to the airport, the agents stopped and bought lunch for themselves and Khan at a quick-mart service station. They also allowed Khan to use the bathroom, with Godwin as an escort. The agents did not remove Khan's restraints before taking him into the restroom at the service station. During the trip to the airport, the agents continued to ask Khan whether Qayyum was his biological father, stating in substance that they believed Khan was lying. Khan continued to deny the agents' accusation.

Once at the airport, the agents boarded the plane with Khan. Godwin either sat in front of Khan or behind him, and Castro sat next to Khan. After departing, Castro and Godwin testified that for the first time Castro told Khan he was an FBI agent. Castro explained to Khan:

1) Due to the United States' war on terrorism, his agency was taking all allegations of terrorism very seriously;

2) He was investigating Defendants Haroon Rashid, Irfan Kamran, and Sajjad Nasser, and he was interested in any information Khan could provide to assist that investigation;

3) He did not suspect Khan was involved in any way with terrorism;

4) He believed the other defendants may have been involved in bringing Khan illegally into the country;

5) He wanted Khan to be a witness against the others in an immigration-fraud prosecution; and

6) Khan would likely be deported to Pakistan.

After explaining these things to Khan, Castro asked him if Defendant Qayyum was his biological father. Khan began to cry and stated for the first time that Qayyum was not his father. Castro then told Khan he wanted to stop the interview until they got to Denver.

It is unclear whether Agent Godwin asked Khan any questions after this point. Godwin testified that he did not; Castro testified that he remembered Godwin asking some other questions. Both agents testified that Khan attempted to engage them in conversation about his circumstances and wanted to make a deal with them.

Due to inclement whether, the FBI plane was forced to land in Grand Junction, Colorado, for the night. Agent Godwin transferred Khan to the custody of

other BICE Agents, who took him to county jail in Grand Junction. Before doing so, Godwin told the BICE agents that Khan had been distraught on the plane. As a result, those agents told the county jailers to put Khan on suicide watch, which they did. As a result, Khan did not have blankets in his jail cell, and testified that he was extremely cold that night and did not sleep.

### C. *March 7, 2003*

Back on the plane the next day, March 7, 2003, Khan again attempted to engage the agents in conversation about what they could do to help him. After landing in Denver, they transported Kahn to the FBI offices downtown. Upon arrival there, Agent Castro fully advised Khan of his *Miranda* rights, both orally and in writing. Khan acknowledged his understanding, then signed a written waiver of his rights, and made a statement to Castro consistent with his statement on the plane after leaving Hayward, memorialized in an FBI report, Form 302. *See* government's Ex. 2. During the interview, Khan was not restrained or physically pressured.

After the interview at the FBI offices, Agent Godwin took Khan to the BICE office in Denver. There, Godwin fully advised Khan of his *Miranda* rights, both orally and in writing. Khan waived these rights, repeated his admissions, and signed a sworn statement prepared by Agent Godwin. That form was not signed in blank. He also signed a form concerning his right to a hearing before an immigration judge, in which he admitted he was in the United States illegally and wished to return to Pakistan. *See* government's Exs. 3–4. Khan was not restrained or physically pressured during this interview, either. But I infer that Khan was in restraints during the flight to Denver and while being transported to the agents' respective offices.

### D. *March 24, 2003*

Seventeen days later, on March 24, 2003, Defendant Khan appeared before federal Immigration Judge David Cordova in Denver. During that hearing, Khan admitted he had entered the United States unlawfully and was ordered deported. He was advised of his right to counsel at the outset of that hearing, but refused counsel.

### E. *Material Witness Issue*

Agents Godwin and Castro consistently testified that they had hoped that Khan would agree to be a cooperating material witness in their developing case against Khan's co-Defendants. Agent Castro testified that upon landing in Grand Junction, Khan again attempted to negotiate "a deal" with the agents. The agents informed him that they would like him to be a witness. Khan told them he would like to help.

Upon completion of the March 24 deportation hearing, Khan testified that he expected to be deported back to Pakistan within about one month. However, after the hearing, Agents Godwin and Castro talked with him in the Wackenhut immigration-detention facility in Denver. There, they informed Khan that they intended for him to stay in the United States to testify against his co-Defendants. Khan informed the agents that he did not want to help them in that way and recanted his earlier admissions. This turn of events motivated the agents to execute an arrest warrant for Khan on June 12, 2003. Finally, on July 22, 2003, Khan was indicted in a superceding indictment in this case that charged him with one count of conspiracy to defraud the United States. This was followed by second and third superceding indictments charging the same count.

### F. Pending Charges Against the Co-Defendants

The third superceding indictment lists the following charges against Khan's co-Defendants:

1) Abdul Qayyum: one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien;

2) Chris Marie Warren: one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien;

3) Haroon Rashid: one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien;

4) Saima Saima: one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien;

5) Irfan Kamran: one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien;

6) Sajjad Nasser: one count of conspiracy to conceal, harbor, or shield from detection an illegal alien; one count of conspiracy to defraud the United States; one count of making false statements to a government official; one count of bring in and harboring an illegal alien.

## II. Law

### A. Warrantless Civil Immigration Arrest

I evaluate whether an agent may properly execute a warrantless immigration arrest using a two-prong statutory test. *See* bold, below.

(a) Powers without warrant: Any officer or employee of [BICE] authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, **[1] if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation *and* [2] is likely to escape before a warrant can be obtained for his arrest**, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2) (emphasis added).

### B. Miranda

#### 1) Generally

■ Any statement taken during a custodial interrogation in violation of *Miranda* is inadmissible to establish a defendant's guilt. *Cordoba v. Hanrahan,* 910 F.2d 691, 693 (10th Cir.1990). The strictures of *Miranda* apply when a suspect is subjected to custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ According to *Miranda,* defendants must receive a rights warning prior to custodial interrogation. The government has the burden of proving that statements made by a defendant during a custodial interrogation were given after an adequate *Miranda* advisement and that the defendant voluntarily, knowingly, and intelli-

gently waived his rights. *Id.* at 444–45, 86 S.Ct. 1602. *See also, Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Moran v. Burbine,* 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

▮▮▮ When a *Miranda* violation is alleged, the heavy burden of proof is upon the government to show the validity of the waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602. In assessing the totality of the circumstances surrounding a *Miranda* waiver, the district court may consider the defendant's age, intelligence, education, language ability, mental condition, experience with the legal system, pressure from law enforcement officers, the explicitness of the waiver, and the length of time between the *Miranda* warning and questioning. *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Finally, "[i]f the accused has signed a waiver form, the Court will presume that the interrogating officers gave the *Miranda* warnings, and that the defendant knowingly and voluntarily waived these rights." *United States v. Mathews,* 431 F.Supp. 70, 74 (W.D.Okla.1976) (citing *Morse v. Wilson,* 500 F.2d 1264, 1268 (10th Cir.1974); *United States v. Romero,* 495 F.2d 1356, 1358 (5th Cir.1974)).

### 2) *Missouri v. Seibert*

The United States Supreme Court recently decided *Missouri v. Seibert,* —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643, 2004 WL 1431864 (June 28, 2004). The Court held that *Miranda* warnings given mid-interrogation, after defendant gave an un-warned confession, were ineffective. Thus, a confession repeated after warnings were given was inadmissible at trial.

The ruling limits *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), on which the government depends, to its facts. In *Elstad,* police went to a young suspect's house to take him into custody on a burglary charge. Before the arrest, one officer spoke with the suspect's mother while the other conducted a "brief stop" of the suspect in the boy's living room where the officer said he "felt" the young man had been involved in the crime. *Id.* at 301, 315, 105 S.Ct. 1285. The suspect acknowledged he had been at the scene. *Id.* Later, at a fully *Mirandized* police-station interrogation, the suspect made a full confession. The Court acknowledged the incident as having no "earmarks of coercion," *id.* at 316, 105 S.Ct. 1285, and concluded that the officer's initial failure to warn was an "oversight" that may have been due to confusion. *Id.* at 315–316, 105 S.Ct. 1285.

The *Seibert* facts contrast those in *Elstad:*

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used.

Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" App. 66. The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

Strategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what Dickerson held Congress could not do by statute. Because the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's post-warning statements are inadmissible.

*Seibert,* 124 S.Ct. at 2612–2614 (footnotes removed).

### III. Discussion

Defendant Khan moves to suppress his post-arrest *Mirandized* incriminating statements made to Agent Castro at the Denver FBI offices on March 7, 2003, memorialized in the FBI Form 302. *See* government's Exhibit 2. He moves to suppress his post-arrest *Mirandized* statements made to Agent Godwin at the BICE offices in Denver as well. *See* governments' Exs. 3–4. Finally, Khan moves to suppress the statements he made during the March 24, 2003 immigration hearing. Khan originally moved to suppress his un-*Mirandized* statements made while on board the FBI plane. Now the government stipulates that it will not use those statements at trial. Therefore, I only consider the statements made on the airplane within the greater context of the suppression motion, but not as separate statements that might be suppressed.

#### A. *Fourth Amendment*

■ It is clear that the agents' intention on March 6, 2003 was not to arrest Khan as the subject of a criminal investigation. Therefore, I do not analyze Defendant's suppression motion from a typical probable-cause perspective. (I do note, however, that the agents did not have probable cause for a criminal arrest.) Instead, I address the question whether the agents had "reason to believe" Khan violated immigration law and was a flight risk.

The government contends that Agents Castro and Godwin had reason to believe that Khan was in the United States in violation of immigration law, pursuant to the first prong of 8 U.S.C. § 1357(a)(2). I agree. Agent Godwin was aware that Khan had entered the United States based on the representation that he was Qayyum's son by reason other than adoption. When Defendant Qayyum was interviewed, however, he stated that he was in Germany during the time that Khan was conceived in Pakistan. Moreover, Godwin had reviewed a summary of an intercepted

telephone conservation where Defendant Qayyum indicated that Khan was not Qayyum's son and Khan was here illegally. Based on their interviews with other defendants in the case, the agents believed that the other defendants talked about Khan in a disrespectful way inconsistent with the way they treated one another. Finally, during the March 6 interview of Khan, the agents believed Khan was lying. I conclude that these factors provided the agents with "reason to believe" Khan was in the United States illegally.

The government also contends that the agents had reason to believed Khan was likely to escape from the agents before a warrant could be obtained for his arrest, under the second prong of 8 U.S.C. § 1357(a)(2). I disagree. As the basis for its contention, the government argues that Khan's legal status in the United States was very much in question. While this may have been true from the agents' perspective, there is no evidence that Khan considered his status perched on tenuous grounds. It is undisputed that he was considered a legal, permanent, resident alien when he was arrested. And while Khan knew that members of his family were being investigated by the FBI, there is no evidence that he knew he was the subject of an immigration-violation investigation.

Moreover, Khan worked two jobs in Petaluma, amounting to approximately 16 hours per day. Aside from that, he owned a vehicle and contributed to rent payments for the apartment he shared with a roommate. Khan testified credibly that he valued his freedom in the United States and worked hard to maintain that freedom.

There is also evidence that Khan was estranged from the family in Denver. However, that fact does not weigh heavily in my calculus. While Khan evidently did not get along with the family, and moved to Petaluma to avoid them, there is no evidence that Khan's relationship with them would make him more prone to flee from the agents.

Finally, Khan had never experienced legal trouble before this case. At base, the agents' reason to believe Khan was a flight risk rests upon nothing more than speculation that their interview with him alone would cause him to "escape." I conclude the government has failed to meet its burden to show reasonable grounds to believe that Khan was likely to escape before a warrant could be obtained. Rather, the facts show that Khan was likely to remain in Petaluma and continue working. Moreover, the agents could have requested a warrant and been issued one before or even after they alerted Khan to their presence. Therefore, I conclude Khan's arrest was in violation of 8 U.S.C. § 1357(a)(2), and Khan was seized in violation of his Fourth Amendment right to be secure in his person against unreasonable seizures.

██ In a criminal proceeding statements obtained as a result of an unlawful, warrantless arrest are subject to suppression as "fruit of the poisonous tree" if the link between the evidence and the unlawful conduct is not attenuated. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also, United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994) (generally, suppression of *Mirandized* statements remedy for Fourth Amendment violation). Fourth Amendment protection against unreasonable searches and seizures fully applies in the civil context. *Soldal v. Cook County,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).

██ Khan's inculpatory March 6 and 7 statements were made only after his March 6 arrest and restraint during an unbroken chain of coercive events close in time. Because there was no break in the chain of events sufficient to attenuate the

Fourth Amendment violation, I conclude that the March 7 statements must be suppressed.

■ However, I conclude that the March 24, 2003 statements are attenuated so they are not subject to suppression. Evidence obtained in violation of the Fourth or Fifth Amendments may be admitted if the prosecution shows by a preponderance of the evidence that it has but an attenuated link to the underlying illegality. *U.S. v. Griffin*, 48 F.3d 1147 (10th Cir.1995), citing *United States v. Ceccolini*, 435 U.S. 268, 273–79, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). While it is true that Khan was in custody from the time of his arrest until his deportation hearing, I conclude that the 18–day gap between the arrest and the civil deportation hearing sufficiently dissipated the taint of the illegal arrest.

### B. *Fifth Amendment*

Aside from the Fourth Amendment question, both parties focus on *Miranda* violations or lack thereof in their suppression analyses. Given the convoluted and evolutionary nature of this case, I too undertake this analysis.

The government admits that Khan was in custody on March 6, 2003 after the agents arrested him and put him in restraints, and admits that the agents interrogated him in the rental car and on the airplane while he was in custody. It is well-established that where an individual is subject to custodial interrogation, any inculpatory statements may not be used unless the individual is provided the procedural protections against self-incrimination set forth in *Miranda v. Arizona*, 384 U.S. at 444–45, 86 S.Ct. 1602 (1966) (Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed from being compelled to incriminate them-

selves.); *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

■ On March 6, 2003, Khan was the subject of an investigation into an immigration violation that led to *civil* deportation proceedings against him. It is clear to me, despite the later criminal charge brought against Khan, that at no time during the March 6 and March 7 interactions among Castro, Godwin, and Khan, was Khan himself the *subject* of a *criminal* investigation. Khan was arrested civilly, albeit without compliance with the Fourth Amendment, as a suspected illegal alien subject to deportation.

Under these circumstances standing alone, a Fifth Amendment right against self-incrimination would not attach. "A deportation proceeding is civil in nature, not criminal, and various constitutional protections associated with criminal proceedings therefore are not required." *Michelson v. INS*, 897 F.2d 465, 467 (10th Cir.1990), citing *Immigration & Naturalization Serv. v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." The exclusionary rule does not apply in the civil-deportation hearing context to require that admission of illegal entry by alien after allegedly unlawful arrest be excluded from evidence).

■ Yet Khan was not the lone focus of a simple immigration investigation. Instead, he was not only the target of civil immigration proceedings, but was also both a potential key witness for the prosecution against the other defendants, and, as it turned out, the eventual target of a

criminal conspiracy investigation that forms the basis for this case. The *Miranda* requirement applies to all custodial interrogations where criminal prosecution *could* result, even if the interrogation is administrative in nature. *See Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (IRS interrogation of a taxpayer suspected of tax fraud); *Mathis v. United States,* 391 U.S. 1, 4, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (same). And the Fifth Amendment privilege against self-incrimination applies not only at criminal trials, but in any other proceeding, civil or criminal, formal or informal, where the answers *might* incriminate defendant in future criminal proceedings. *United States v. Lee,* 315 F.3d 206 (3rd Cir.), *cert. denied,* — U.S. —, 124 S.Ct. 160, 157 L.Ed.2d 106, 2003 WL 21456836 (2003).

Khan was a person who allegedly had information that would assist the government in their criminal case against the other defendants. Yet I am convinced that the agents knew during their interrogations of him that the information he provided them *could* result in his criminal prosecution. Indeed, that is what happened here. While Agent Castro's role as a criminal case agent was to investigate alleged terrorist activities in which Defendants Haroon Rashid, Sajjad Nasser, and Imran Kamran participated, he accompanied Agent Godwin knowing that potential criminal charges against Khan could attach, depending on Khan's answers to the agents' questions.

 Moreover, as pertains more fully below, a civil action cannot be used to force *involuntary* self-incriminating testimony from a person who is charged or may potentially be charged with a crime. *U.S. v. Premises Located at 207 West Washington Street, Athens, Ala.,* 732 F.Supp. 1128 (N.D.Ala.1990). Even in the immigration context, if a defendant faces criminal-rather than civil-charges, *Miranda* applies. For example, lack of *Miranda* warnings can render an alien's statement, made during a custodial interrogation, inadmissible in a criminal prosecution for violation of immigration laws. *Chavez–Raya v. Immigration & Naturalization Service,* 519 F.2d 397 (7th Cir. 1975). *See also, Alvarez–Mendez v. Stock,* 746 F.Supp. 1006 (C.D.Cal.), *aff'd,* 941 F.2d 956, *cert. denied,* 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992) (excludable alien is entitled to *Miranda* rights).

I conclude that while Khan was not and has never been the subject of the terrorism investigation, and Castro told him as much on the airplane, Khan was always subject to future criminal prosecution for conspiracy to defraud the United States, a charge wholly separate from his civil deportation proceedings. Therefore, I conclude *Miranda* applies. The question then is which statements should be suppressed for violation of *Miranda.*

### 1. *March 6 and 7 Statements*

As I stated above, the government has stipulated that it does not intend to use the March 6, 2003 inculpatory statements Khan made in response to Agent Castro's questions while on the plane. It is undisputed that Khan made those statements without the benefit of a *Miranda* warning beforehand. The government contends under *Elstad,* 470 U.S. 298, 105 S.Ct. 1285, that the agents' failure to administer *Miranda* warnings at any time on March 6 prior to Khan making inculpatory statements on the plane does not bar admission of the post-*Miranda* statements Khan made at the FBI and BICE offices in Denver the next day because Khan made the first, un-*Mirandized* statements voluntarily.

First, I am not persuaded that Khan's statements-which undisputedly contradict-

ed what he had said earlier in the day to the agents-were made voluntarily. *Elstad* defines a voluntary statement as one given absent the pressure of "techniques and methods" used by law enforcement that are "offensive to due process," or under circumstances in which the suspect clearly had an opportunity to exercise "a free and unconstrained will." *Elstad* at 304, 105 S.Ct. 1285. So the question is whether the agents coerced Khan to make incriminatory statements. Before Khan was arrested, Khan suggested that he and the agents converse in the agents' car. Khan voluntarily left his apartment, and voluntarily talked with the agents in the car for approximately 90 minutes to two hours.

 Upon Khan's arrest, however, Khan no longer was able to exercise a "free and unconstrained will." Khan was physically restrained in handcuffs, leg irons and a belly chain. Khan was told he was being taken to Denver, but was not told the airplane would stop in Grand Junction. Khan was interrogated while in his physical restraints both in the car on the way to the airport, and on the small, 6–to–8–passenger airplane. Agent Castro told Khan he would most likely be deported. When Khan made incriminating statements on the airplane on March 6, I conclude that he did so without *Miranda* advisement and under coercion. And while it was not necessarily the intention of the agents to do so, Khan was deprived of a blanket while in his cold cell in Grand Junction and was unable to sleep. This reinforced the coercive atmosphere Khan experienced earlier in the day. When Khan made his statements at the FBI and BICE offices on March 7, he had already been exposed to an unbroken chain of coercive circumstances. Second, even if I were to conclude that Khan made his statements voluntarily, *Missouri v. Seibert* precludes *Elstad*'s application here. As in *Seibert*, the question-first, *Mirandize*-later tactic used here thwarts *Miranda*'s

purpose of reducing the risk that a coerced confession would be admitted. The government fails to persuade me that the *Miranda* warnings given on March 7 could have served their purpose, given the circumstances Khan endured before giving those statements. Therefore, Khan's post-warning, March 7, statements are inadmissible under a Fifth Amendment analysis.

## 2. *March 24 Statements*

 Generally, aliens are not entitled to a *Miranda*-type warning of the right to remain silent at deportation hearings. *United States v. Valdez,* 917 F.2d 466 (10th Cir.1990). A deportation proceeding is civil in nature, not criminal and, thus, an alien may be required to answer questions about his status and his right to remain in the country. *Smith v. Immigration & Naturalization Service,* 585 F.2d 600 (3rd Cir.1978). However, this is only true as long as the alien's answers would not subject him to criminal liability, and his responses could be used to prove deportability. *Id.*

An alien can, of course, because of the possibility of criminal prosecution for violation of the immigration laws, decline to testify at the deportation hearing on the basis of the Fifth Amendment. *Valeros v. Immigration & Naturalization Serv.,* 387 F.2d 921, 922 (7th Cir.1967). An alien may, however, unlike the criminal defendant, be required to answer non-incriminatory questions about his alien status. *See Laqui v. Immigration & Naturalization Serv.,* 422 F.2d 807, 809 (7th Cir.1970). And an alien's silence may be used as the basis for drawing certain adverse inferences at least with respect to non-incriminatory matters. *Chavez–Raya v. Immigration and Naturalization Serv.,* 519 F.2d 397 (7th Cir.1975).

Here, Khan's admissions during the March 24 hearing subjected him to the criminal liability that is the subject of this case. While it is clear that un-*Mirandized* and voluntary statements by an immigration detainee may be used against him in a civil deportation proceeding itself, only one Circuit has said that those statements "might" be subject to suppression in a subsequent criminal proceeding, such as the one here. *See United States v. Alderete–Deras,* 743 F.2d 645, 648 (9th Cir. 1984). In a subsequent Ninth Circuit case, however, the Court stated in regard to its earlier decision:

> In *Alderete–Deras,* we suggested that the lack of a *Miranda* warning at a civil deportation hearing 'might' render statements made during that hearing inadmissible in a subsequent criminal trial. The Fifth Amendment to the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' As a procedural safeguard to protect this privilege against self-incrimination, the prosecution may not use any statement obtained by law enforcement officers as a result of 'custodial interrogation,' unless the defendant received *Miranda* warnings prior to the interrogation.
>
> The test to determine whether questioning is 'interrogation' within the meaning of *Miranda* is whether 'under all of the circumstances involved in a given case,' the questions are 'reasonably likely to elicit an incriminating response from the suspect.' Because the immigration judge's questions were not reasonably likely to elicit an incriminating response from Solano, Solano was not interrogated within the meaning of *Miranda* at his deportation hearing.

*U.S. v. Solano–Godines,* 120 F.3d 957 (9th Cir.1997).

Similarly, Judge Cordova's questions to Khan at the March 24 deportation hearing were not calculated to elicit responses that would incriminate Khan in the criminal case (which at that time did not target Khan). Rather, I am convinced the Judge posed typical questions to Khan regarding the circumstances of his presence in the United States. Moreover, Judge Cordova is not a law-enforcement officer. I am not persuaded that his statements during the deportation hearing are subject to suppression for violation of his Fifth Amendment rights.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

DEFENDANT KHAN's motion to suppress is GRANTED IN PART as to the May 7, 2003 statements and DENIED IN PART as to the May 24, 2003 statements made during the deportation hearing.