Filed 3/9/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C073188 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF11382) |
| v. | |
| CESAR VILLA-GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yuba County, Stephen W. Berrier, Judge. Affirmed as modified.

Jonathan E. Berger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., V., and IV. of the Discussion.

1

Defendant Cesar Villa-Gomez appeals following a judgment of conviction after a jury trial. He was charged with multiple assault and gang-related counts arising out of a group attack on fellow prisoners in the Yuba County jail. The jury found defendant guilty, and he was sentenced to six years in state prison.

On appeal, defendant contends that the trial court erred in admitting his statements made in response to jail classification questions about his gang membership. In the published portion of this opinion, we conclude that the trial court did not err in allowing defendant's statements concerning his gang affiliation made at booking. Because the crime for which defendant was prosecuted had not yet been committed at the time he answered the classification deputy's questions, those questions were not reasonably likely to illicit an incriminating response. Thus, the questions did not amount to interrogation as defined in *Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308] (*Innis*) as applied by our high court in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*). Furthermore, any error in admitting these statements was harmless beyond a reasonable doubt.

Defendant also makes several other contentions which we address in the unpublished portion of this opinion. Defendant contends: (1) there is not sufficient evidence to support his conviction for simple assault; (2) there is not sufficient evidence to support the findings on the participation in a criminal street gang count and gang enhancements; (3) the trial court failed to properly instruct the jury that defendant's knowledge that other participants were gang members is an element of the offense of active participation in a criminal street gang and the gang enhancement; and (4) the prosecutor's comments during closing argument about the credibility of a police witness was prejudicial prosecutorial misconduct.

Our review has revealed an unauthorized sentence related to a count that was subject to Penal Code section 654.[1] On count 3, active participation in a criminal street gang, we order imposition of a full-term sentence instead of one-third the midterm imposed by the court and further order execution of that sentence stayed pursuant to section 654. (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.) We select the midterm because the trial court imposed a midterm sentence as the principle term and "undoubtedly" would impose and stay execution of that term on count 3 if we were to remand. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473.) We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charged Offenses and Enhancements

Defendant and a co-defendant Victor Hernandez were charged with assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); counts 1 & 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[2] It was further alleged as to both assault counts that defendant and Hernandez committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).[3]

### Trial Evidence

On January 8, 2011, a fight broke out among the prisoners in B pod of the Yuba County jail after a number of new prisoners were moved into the pod. One of those new prisoners was defendant. Prior to the fight, B pod was a "no-programming" pod, which

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[2] Prior to trial, Hernandez pleaded guilty to participation in a criminal street gang and was sentenced to a term of 16 months in state prison. He is not a party to this appeal.

[3] At trial, the prosecution's theory was that the assaults were committed *for the benefit of* or *in association with* a criminal street gang.

meant that the prisoners housed in that pod were free to associate with one another and sleep anywhere they wanted without risking retaliation, regardless of ethnicity or gang affiliation. There were no bunk assignments in B pod.

Enrique Nunez was a prisoner in B pod on the day of the incident. He testified that he had been in custody there for two to three months, during which time there had been no problems. He was not a Norteño or otherwise gang affiliated, but the prisoners in B pod who were Norteños were known to everyone in the pod. At first, the Norteños in the pod did not program, but as new gang members arrived, the Norteños started hanging out, exercising together, and taking over the pod. On January 8, the B pod prisoners who were members of the Norteño gang decided that they "wanted to program," and they "wanted to be close to each other just in case something happened." The Norteños told non-Norteños to move to other bunks. Nunez testified that they told his non-Norteño bunkmate "he had to move because they needed that bunk because they wanted to be close to each other."

Nunez approached Norteño gang member Lema Castro and told him he was not going to move because he was there first and if the Norteños wanted to program, they should go to another pod. Castro told Nunez that they were going to program, asked Nunez what he was going to do about it and thereafter began hitting Nunez. In an effort to defend himself, Nunez grabbed Castro by the neck and pushed him against the wall. As he did, three other Norteños, including Jesus Osuna, started hitting Nunez. Norteño Victor Hernandez ran down the stairs and struck Nunez in the forehead causing a cut. Vicente Serrano-Gomez, another prisoner who Nunez described as a Salvadorian, tried to help him and break up the fight, but the Norteños started hitting Serrano-Gomez as well. The fight eventually involved eight to ten prisoners.

Nunez initially testified that he did not remember whether defendant was one of the new Norteños that had come into the pod. However, when his recollection was refreshed with a photograph depicting defendant's appearance at the time of the attack,

4

Nunez testified that he thought defendant was one of the men who attacked him. Specifically, upon showing Nunez defendant's photo, the prosecutor asked, "[W]as he in B pod?" Nunez responded, "Yes. I think that is one of them. I don't remember exactly, but I think that is one of them." The prosecutor then asked, "You think this is one of the ones that attacked you?" to which Nunez, responded, "Yes." Later, when shown the photographic lineup in which he had previously indentified defendant, Nunez's recollection was refreshed that he had identified defendant in that line-up as the "new guy" for whom the Norteños were making bunk space, and after the prosecutor refreshed his memory with his initials on the photographic lineup, Nunez testified that defendant was "the new guy that came in the cell the Norteños were making bunk space for." When the prosecutor asked Nunez whether defendant "was one of the guys that took part in the assault on [him]," he responded, "Yeah, I think so. Yeah, because I didn't have a lot of time to meet them. It was almost the same day or second day that they got there." On cross-examination, Nunez definitively stated that defendant was one of the men "involved in the fight." He explained that he did not recognize defendant initially because "[h]e is a little thinner, but it is him. I recognize him." On redirect examination, Nunez again confirmed that defendant was the man he identified in the photographic line-up.

Serrano-Gomez testified that the Norteños were moving people around because a new Norteño came into the pod. When the group tried to remove another inmate from his bunk, Nunez went over to the group and said that it was not fair that they told that inmate to move. One member of the group then attacked Nunez from the front and another member attacked him from the back. When Serrano-Gomez tried to stop the fight, three people began beating him, including defendant and Hernandez. As a result, Serrano-Gomez sustained a cut to his eyebrow that bled. Shortly after the incident, Serrano-Gomez identified defendant in a photographic line-up as the new guy who had moved

5

into B pod. At trial, Serrano-Gomez identified defendant as one of the people who assaulted him. Serrano-Gomez did not see whether defendant hit Nunez.

Defendant was not in the jail pending criminal charges. He had been booked into the jail on an immigration hold. During the booking process, defendant was interviewed by Deputy Brandon Charter for classification purposes. Deputy Charter testified that the purpose of classification is "[t]o appropriately house inmates that come into the jail to ensure their safety and officers' safety." Defendant told Deputy Charter he was a "Northerner" or Norteño.

Deputy Charter had training and experience with gangs in a custodial setting. Based upon this experience, he indicated that when there is a spontaneous fight between a Norteño and another prisoner, other Norteños are required to jump in and fight. If a Norteño fails to join in the fight, the gang makes him leave the pod and possibly assaults him.

Deputy Charter testified that after the fight, the guards checked the prisoners' knuckles for redness, swelling, and scrapes and those prisoners who had such injuries were "pulled out." Deputy Charter further testified that defendant "was one of the people that was pulled out first" when the guards checked his knuckles, and the only reason he would have been pulled out is if his knuckles showed signs of fighting. He did not independently recall seeing defendant's knuckles and conceded that his written report did not include a description of defendant having scrapes or redness on his knuckles. However, defendant did have red marks on his right eye and face.

Deputy Sean Moore testified as a gang expert. Based on his experience and the reports of the incident, Deputy Moore opined that the attack was gang related. He testified that all of the prisoners who took part in the assault, except for the victims, were validated as Norteños. Deputy Moore testified that Osuna admitted that he participated in the assault because he knew he would be "rolled out" of the gang or assaulted by its members if he did not. Osuna pleaded guilty to the misdemeanor charge of participating

6

in a criminal street gang as a result. Castro was validated by Deputy Moore as a gang member for his participation in the attack. Timothy Evans also pleaded guilty to his participation in a criminal street gang and was validated as a gang member for his participation in the attack. Hernandez, who testified at trial that he was a Norteño at the time of the attack, was also validated as a gang member because of his participation in the attack and his multiple prior contacts with law enforcement as a gang member.

Deputy Moore opined that defendant was an active gang member at the time of the attack as well. He testified that his opinion was based on defendant's admission during classification that he was a Norteño, Serrano-Gomez's identification of defendant as one of the Norteños who attacked him, defendant's arrest with a gang for this gang-related offense, and his affiliation with the gang "because he was identified as the new person in the pod they were trying to make room for." Additionally, Deputy Moore testified that based on his training and experience, the Norteños would not make room in the pod for a non-Norteño.

Deputy Moore further opined that the attack was done for the benefit of and in association with the Norteños, a criminal street gang. Nunez had disrespected the gang by telling Castro that they could not program in the pod. Attacking him showed other prisoners in the pod that the Norteños would not tolerate disrespect. Deputy Moore testified that the classification record showed that defendant was placed in the pod around 1:00 p.m., and the attack occurred between 6:00 and 7:00 p.m., about five to six hours after defendant entered the pod. Nunez told Deputy Moore that the Norteños said they were moving people around for the new guy because he was " 'one of us.' "

### Verdicts and Sentencing

The jury found defendant guilty as charged on count 2, assault with force likely to produce great bodily injury (victim - Serrano-Gomez), and count 3, active participation in a criminal street gang, and found both gang enhancements true. On count 1 (victim - Nunez), the jury found defendant guilty of the lesser included offense of simple assault.

7

The trial court subsequently sentenced defendant to the mid-term of three years for the aggravated assault conviction on count 2, plus a consecutive three-year term pursuant to the gang enhancement under section 186.22, subdivision (b). The court also sentenced defendant to a concurrent eight-month sentence for the simple assault conviction in count 1,[4] and stayed an eight-month sentence (one-third the midterm) for the active participation in criminal street gang conviction in count 3 pursuant to section 654.

## DISCUSSION

### I. Defendant's Jail Classification Statements Regarding Gang Membership

### A. Additional Background and the Parties' Contentions

Prior to trial, defendant moved in limine to exclude evidence of his admission that he was a Norteño gang member made during the classification interview to Deputy Charter. The trial court denied the motion, reasoning that this evidence was admissible as an "admission made for purposes of classification before the offense that is alleged in the Information," falling within the routine booking question exception to *Miranda*.[5]

Defendant contends the court violated his Fifth Amendment privilege against self-incrimination under *Miranda*, by admitting into evidence his statements to the jail classification officer that he was an active Norteño gang member. He contends that the California Supreme Court's opinion in *Elizalde, supra*, 61 Cal.4th 523 "squarely holds that the *Miranda* exception for routine booking questions does not apply to questions about gang affiliation; that is, that defendants' responses to such questions may not be introduced into evidence in the prosecution's case-in-chief if the defendant was not

---

[4] At the prosecutor's request, the trial court treated the alternate sentencing provision in section 186.22, subdivision (d), and the 186.22, subdivision (b)(1), enhancement "the same in terms of what they say" and imposed the eight-month sentence on simple assault, a lesser offense to count 1, under subdivision (d) based on the jury's enhancement finding under subdivision (b).

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

8

admonished, as described in *Miranda*, before the question was asked."[6]  He further argues that *Elizalde* stands for the proposition that *all* un-*Mirandized* responses to booking questions about gang affiliation are inadmissible in the prosecution's case-in-chief, regardless of what offense is charged.

The People contend that the instant case is distinguishable from *Elizalde* because, unlike the defendant in that case, at the time of the classification questioning here, defendant was not charged with an offense frequently committed for the benefit of criminal street gangs but rather, he was in custody on an immigration hold.  The People further contend that "the critical question [under *Elizalde*] is whether Deputy Charter should have known that his booking question about gang affiliation would have elicited an incriminating response from [defendant] under the circumstances of this case."  The People reason that because gang membership is not in and of itself a crime and because defendant was not charged with any crime at the time of the booking question, "it cannot be said that Deputy Charter should have known that it was reasonably likely his inquiry would have elicited an incriminating response from [defendant].  To hold otherwise would be unsound, for it would require law enforcement to anticipate any and all future criminal conduct that may or may not be committed by people they question about gang affiliation during the booking process."  Finally, the People contend that even if we conclude that the trial court erred in admitting this evidence, any error is harmless because there was ample other evidence in the record of defendant's gang affiliation.

## B.  Analysis

### 1.  *Innis* Interrogation

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

---

[6]  We granted the parties' request for supplemental briefing after *Elizalde* was published.

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra*, 384 U.S. at p. 444.) An individual is subjected to "custodial interrogation" whenever law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. (*Ibid*.) The term "interrogation" under *Miranda* refers not only to express questioning, but also to the " 'functional equivalent' " of express questioning. (*Innis, supra*, 446 U.S. at pp. 300-301.) The court in *Innis* defined the functional equivalent of express questioning as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Ibid*.)

Under the booking exception, no *Miranda* warnings need to be given prior to police communications that are "normally attendant to arrest and custody." (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600-601 [110 L.Ed.2d 528, 551] (plur. opn. of Brennan, J.) (*Muniz*); *Innis, supra*, 446 U.S. at p. 301; *People v. Andreasen* (2013) 214 Cal.App.4th 70, 87.) These are communications associated with police administrative duties that are distinct from investigatory duties (*Andreasen*, at p. 87) and include such inquiries as questions concerning biographical information. (*People v. Williams* (2013) 56 Cal.4th 165, 187, citing *Muniz*, at p. 601 (plur. opn. of Brennan, J.).)

In *Elizalde*, our high court addressed the question of "whether routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges, come within *Miranda*'s well-recognized booking exception." (*Elizalde, supra*, 61 Cal.4th at p. 527.) Our Supreme Court held, "Gang affiliation questions do not conform to the narrow exception contemplated in *Innis* and *Muniz* for basic identifying biographical data necessary for booking or pretrial services. Instead, they must be measured under the general *Innis* test, which defines as 'interrogation' questions the police should know are 'reasonably likely to elicit an incriminating response.' " (*Elizalde*, at p. 538.) The court further held that under the circumstances in *Elizalde*, the

10

gang affiliation questions were reasonably likely to elicit an incriminating response given California's criminal gang statutes and the defendant's pending charges. (*Id.* at pp. 538-540.) The *Elizalde* court observed that the defendant was "asked to disclose whether he was a member or associate of an established criminal street gang whose members have a history of committing violence against rival gangs" and he was charged with murder, "a crime frequently committed for the benefit of criminal street gangs." (*Id.* at p. 540.) The court concluded, "*Under these circumstances*, questions about [the defendant's] gang affiliation were reasonably likely to elicit an incriminating response potentially exposing [the defendant] to prosecution for the crime of gang participation [citations] and to enhanced punishment [citations]. This likelihood was apparent even if the deputies' subjective intention was benign." (*Ibid.*, italics added.)

*Elizalde* does not, as defendant suggests, hold that *all* un-*Mirandized* responses to booking questions about gang affiliation are categorically inadmissible. Rather, the *Elizalde* court simply held that these questions do not fall within the narrow booking exception and must be analyzed under the *Innis* test for the functional equivalent of express questioning. (*Elizalde, supra*, 61 Cal.4th at p. 538.) Accordingly, we must determine whether under the circumstances of this case, the classification deputy should have known defendant's responses to the gang affiliation questions were reasonably likely to elicit an incriminating response. We conclude that they were not.

As we have noted, the *Elizalde* court held the booking officer should have known it was reasonably likely the gang affiliation questions would have yielded an incriminating response because the defendant's gang had previously committed violent crimes against rivals and defendant was charged with murder, a crime frequently committed for the benefit of criminal street gangs. (*Elizalde, supra*, 61 Cal.4th at p. 540.) Thus, under *Elizalde*, "[w]hether or not a gang-related inquiry by jail personnel requires a *Miranda* admonition will depend on the nature of the charges the inmate is facing." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1015.) Here, defendant was not yet

11

charged or suspected of *any* crime—commonly committed for the benefit of gangs or otherwise—as the charged crimes had not yet occurred. Rather, he was in custody on an immigration hold while United States Immigration and Customs Enforcement determined his immigration status. Nothing the *Elizalde* court wrote suggests its holding should apply to crimes that have not yet been committed at the time of the inquiry, and we decline to extend *Miranda* and *Innis* that far.

*United States v. Solano-Godines* (9th Cir. 1997) 120 F.3d 957 (*Solano-Godines*) provides guidance concerning the applicability of *Miranda* and *Innis* to future crimes. In that case, the issue was whether the defendant's responses to an immigration judge's questions during a civil deportation proceeding were admissible in a subsequent criminal case involving a crime that occurred *after* the questioning.[7] (*Solano-Godines*, at pp. 959-962.) The Ninth Circuit, applying the *Innis* test, held that the immigration judge's questions were not reasonably likely to elicit an incriminating response. (*Solano-Godines*, at p. 961.) The court reasoned that "[t]he immigration judge could not be expected to anticipate that two years later [the defendant] would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime." (*Id.* at p. 962; see also *Fults v. United States* (10th Cir. 1968) 395 F.2d 852, 854 [holding that *Miranda* was not applicable where "the crime was committed some time after [the defendant]'s statement was made"]; *State v. Allen* (Or.Ct.App. 1984) 680 P.2d 997, 999 [reasoning that statements made by an inmate during psychiatric examinations were not inadmissible

---

[7] The responses the defendant gave were to the immigration judge's questions as to his place of birth, his citizenship, and his prior convictions and deportations. (*Solano-Godines, supra*, 120 F.3d at p. 960.) After the civil deportation proceedings, the defendant was deported, but later tried to reenter the country using a false name and was charged with illegal reentry following a felony conviction and false representation of United States citizenship. It was in this prosecution that his earlier statements to the immigration judge were admitted in evidence against him. (*Ibid.*)

under *Miranda* because "[p]otential use of the examinations in a later prosecution for crimes not yet (and, one would hope, not ever) committed was wholly unforeseen"].) The result in *Solano-Godines* flows naturally from the reasoning in *Innis*: "[S]ince the *police surely cannot be held accountable for the unforeseeable results of their words or actions*, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [Fn. omitted.]" (*Innis, supra*, 446 U.S. at pp. 301-302, first italics added.) Thus, it is only when the incriminating results of police words or conduct are reasonably foreseeable that those words or conduct can be considered interrogation for *Miranda* purposes.

Consequently, under the circumstances of this case, where defendant was questioned about his gang affiliation *before* the offense even occurred, we cannot conclude that the classification deputy objectively should have known that his questions were reasonably likely to elicit an incriminating response under the *Innis* test. To hold that it was reasonably likely the gang affiliation questions here would elicit an incriminating response would be the same as holding it was: (1) reasonably likely that defendant would commit a crime in the future; (2) it was also reasonably likely his responses could be used against him in the prosecution of that future crime; and (3) a reasonable booking officer should have foreseen these inevitable occurrences. In our view, *Innis* does not apply to such unforeseen occurrences and consequently, *Miranda* cannot be extended to require warnings related to crimes that have not yet been committed. Accordingly, we conclude that the trial court properly admitted defendant's statement that he was a Norteño gang member.

### 2. Prejudice

Even if the trial court erred in admitting defendant's gang affiliation statements during booking, the error was not prejudicial. The admission of a defendant's statements in violation of the Fifth Amendment is reviewed under the beyond a reasonable doubt

13

standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*). (*Elizalde, supra*, 61 Cal.4th at p. 542.) To establish that any error in admitting defendant's statement about his gang affiliation is harmless under *Chapman*, the People must establish beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*Ibid*.) This requires that we make a judgment about the significance of the statements to reasonable jurors, when measured against the other evidence considered by the jurors independently of those statements. (*Yates v. Evatt* (1991) 500 U.S. 391, 403-404 [114 L.Ed.2d 432, 449] [determining whether an instruction providing for an unconstitutional presumption did not contribute to the verdict calls for "a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption"].)

In *Elizalde*, our high court held that the erroneous admission of responses to the jail booking questions in that case was harmless beyond a reasonable doubt where the defendant's gang membership was "amply established by independent and uncontradicted evidence." (*Elizalde, supra*, 61 Cal.4th at p. 542.) The evidence in *Elizalde* consisted of three witnesses who testified that they knew the defendant to be a gang member and the gang expert opined that defendant was a gang member. (*Ibid*.)

Before discussing the evidence in the instant case that demonstrates the purported error concerning defendant's admission about his gang membership was harmless, it is first important to point out that gang membership is not an element of the gang enhancement under section 186.22, subdivision (b). There is no requirement that the defendant be an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1). (*People v. Sanchez* (2016) 63 Cal.4th 665, 698; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402, citing *In re Ramon T.* (1997) 57

14

Cal.App.4th 201, 207.)  Section 186.22, subdivision (b)(1), applies to "*any person* who is convicted of a felony committed for the benefit of, at the direction of, or in association with" the gang and who acted with the requisite specific intent.  (Italics added.)  The required intent is "the specific intent to benefit, further, or promote the gang."  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 (*Rodriguez*).)  Gang membership is simply circumstantial evidence establishing that the crime was gang related and a motive for why a defendant may have harbored the "specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1); *Sanchez*, at pp. 698-699.)  Here, the evidence establishes beyond a reasonable doubt that the assaults were gang related and that defendant acted with the requisite intent.

Similar to *Elizalde*, the record contains convincing independent and uncontradicted evidence of defendant's gang membership beyond his admission during booking.  While the evidence is different from *Elizalde*, it is nevertheless uncontradicted and no less convincing.  Nunez had identified defendant in a photographic line-up after the incident as " 'the new guy' " for whom the Norteños were making bunk space, and the Norteños identified defendant to Nunez, as " 'one of us.' "  At the trial, Nunez identified defendant during the trial as, at the very least, one of the Norteños who was "involved in the fight."  Serrano-Gomez also identified defendant in a photographic line-up as the new guy who had moved into B pod the day of the fight and further identified defendant at trial as one of the people who assaulted him.  The other men involved in the attack were all identified by Nunez and Serrano-Gomez as Norteños, and Hernandez and Evans both testified that they were Norteños at the time of the attack.

In addition to the witness testimony and admissions of accomplices Hernandez and Evans, Deputy Moore opined as an expert witness that the other attackers were all validated as active Norteños.  Deputy Charter testified that when there is a fight between a Norteño and another prisoner, other Norteños are required to jump in and fight.  And as we have noted, defendant was identified as being involved in the fight.  Furthermore,

15

without contradiction, Deputy Moore opined that the Norteños would not make room in the pod for a non-Norteño. Additionally, Deputy Moore testified that he based his opinion that defendant was a Norteño not only on defendant's admission during booking, but also on other factors listed in the Department of Justice's validation criteria[8] as well as facts related to the case, including: Serrano-Gomez's identification of defendant as one of the people who attacked him; defendant's arrest[9] with a gang for this gang-related offense; and defendant's affiliation with the gang based on his having been "identified as the new person in the pod they were trying to make room for."

Thus, even without defendant's admission of gang membership, the remaining evidence established beyond a reasonable doubt the elements of the gang enhancement: that defendant was a *person* convicted of a felony in this case; that the felony was committed for the benefit of or in association with the Norteño gang; and that that defendant had the requisite "specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Like the gang enhancement, a defendant need not be a member of the gang to be convicted of active participation in a criminal street gang under section 186.22, subdivision (a). " 'A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22(a).' " (*People v.*

---

[8] Deputy Moore explained that they validate based on at least two of the ten criteria.

[9] While Deputy Moore relied on defendant's *arrest* with the gang and his *arrest* for this gang-related offense as two of the factors supporting his opinion, the fact that he was arrested with other gang members does not seem as compelling in a custodial setting as it might in a noncustodial setting. However, we note that Deputy Moore would have been justified in using the defendant's *commission* of the charged crime with gang members as one of the factors upon which he based his opinion about defendant's gang membership. (See *People v. Castenada* (2001) 23 Cal.4th 743, 752-753 (*Castenada*) [evidence of defendant's participation in the charged crimes with other gang members was evidence the court considered in determining the "active participation" element of the gang crime under § 186.22, subd. (a)].)

16

*Johnson* (2013) 57 Cal.4th 250, 259; *Rodriguez, supra*, 55 Cal.4th at p. 1130.) To prove active participation, it is not necessary to show that the defendant devoted all or a substantial amount of his time to the gang. (*Castenada, supra*, 23 Cal.4th at pp. 747-752.) Rather, the prosecution need only prove that defendant's involvement with the gang was "more than nominal or passive." (*Rodriguez*, at p. 1130; *Castenada*, at p. 747.) The evidence showing defendant's personal involvement in the fight over cell arrangements for him and the other Norteños showed beyond a reasonable doubt that defendant was involved more than nominally or passively without his admission of gang membership to the classification deputy.

Thus, the admission of the defendant's statement to the classification deputy about his gang membership was unimportant in relation to everything else the jury considered on the elements of both the gang enhancement and the gang crime. (*Neal, supra*, 31 Cal.4th at p. 86.) In light of the independent and uncontradicted evidence we have discussed and the inferences drawn there from, we conclude that any error in admitting defendant's statements to the booking officer that he was an active Norteño gang member was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at p. 24; *Elizalde, supra*, 61 Cal.4th at p. 542.)

## II. Sufficiency of the Evidence Supporting Conviction for Simple Assault

### A. The Parties' Contentions

Defendant contends there is insufficient evidence to support his conviction for simple assault on Nunez, and as a result, his due process rights have been violated. In particular, he argues that "the record is devoid of evidence that [defendant] 'made the attempt to strike' Nunez." The People respond that Nunez identified defendant on cross-examination as one of the men who attacked him, and this evidence is sufficient to support the verdict. We conclude there was substantial evidence supporting the assault conviction.

## B. Analysis

When we review a claim that the evidence was insufficient to support a conviction, "the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573].) " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).)

While defendant was charged with assault upon Nunez by means of force likely to produce great bodily injury pursuant to section 245, subdivision (a)(1), the jury found him guilty of the lesser included offense of simple assault under section 240. Section 240 defines a simple assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." An assault does not "require a touching of the victim." (*People v. Bell* (2009) 179 Cal.App.4th 428, 438.)

Here, the evidence that defendant was a direct perpetrator in an assault on Nunez is largely based on Nunez's testimony. However, as our high court has held, "The

18

uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) While at first, Nunez said he did not remember whether defendant was the new Norteño who had come into the pod, after the prosecutor refreshed his memory first with a photograph and thereafter with Nunez's initials on the photographic line-up identification, he confirmed that defendant was "the new guy that came in the cell the Norteños were making bunk space for." The prosecutor twice asked Nunez whether defendant was one of the people who assaulted him. First, after showing Nunez a photograph of defendant, the prosecutor asked, "You think this is one of the ones that attacked you?" Nunez replied, "Yes." Then later, when asked about the photographic lineup identification, the prosecutor asked Nunez whether defendant "was one of the guys that took part in the assault on [him]," he testified: "Yeah, I think so. Yeah, because I didn't have a lot of time to meet them. It was like almost the same day or second day that they got there. So I don't really remember him because I didn't really usually talk to him or I didn't really live with him a lot." On cross-examination, when defense counsel followed up on this testimony, he asked, "But you didn't remember -- you didn't remember -- you didn't know if he was *involved in the fight*; right?" Nunez responded, "He was *involved in the fight*." (Italics added.) When defense counsel asked, "So earlier when you said you didn't recognize him --," Nunez explained that he did not recognize defendant initially because "[h]e is a little thinner, but it is him. I recognize him."

Defendant argues that this latter exchange on cross-examination did not "establish that [defendant] assaulted Nunez; it establishes only that Nunez recognized [defendant] as having been 'involved in the fight,' " and this could have been a reference to the subsequent larger fight with Serrano-Gomez. We note that the jury was instructed on aiding and abetting liability. Thus, even if defendant did not strike or attempt to strike Nunez, evidence of defendant's involvement in the fight to take over a bunk in Nunez's

19

cell supported in his conviction for the assault on Nunez under an aiding and abetting theory.

Moreover, as for the evidence establishing that defendant was a direct perpetrator of the assault on Nunez, the only times Nunez testified about not recognizing defendant on direct examination were in response to questions about whether defendant was the new Norteño in the pod and in response to the question about whether defendant "took part in the assault" on him. Based on our reading of the direct and cross-examination questions and answers, it seems clear that when defense counsel asked about defendant being "involved in the fight," counsel was referring to Nunez's "earlier" testimony on direct examination that he did not recognize defendant as the new guy and Nunez's equivocal testimony on direct examination about whether he recognized defendant as "one of the guys that took part in the assault on [him]." It was in this context that the question was asked on cross-examination about defendant being involved in the fight. Nunez was definitive in his identification of defendant in response to that question.

In any event, it was within the "exclusive province" of the jury to determine whether these conflicts in Nunez's testimony affected his credibility. (*Maury, supra*, 30 Cal.4th at p. 403 ["[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment"].) Viewing the record in the light most favorable to the judgment, as we must do, we conclude that the jury's verdict on count 1 was supported by substantial evidence.

## III. Sufficiency of the Evidence Supporting Gang Offense and Enhancements
### A. The Parties' Contentions

Defendant contends that the record lacks "evidence sufficient to support a conclusion that [defendant] was aware that the fight was gang-related, or that he knew the other participants in it were gang members." Defendant argues knowledge that the people he is associating with are gang members is an element of *both* the substantive

20

offense of active participation in a gang (§ 186.22, subd. (a))[10] and the gang enhancement (§ 186.22, subd. (b)(1)),[11] and therefore both convictions must be reversed.  He further contends that his conviction for the gang enhancement under section 186.22, subdivision (b), violates his right to due process because it is unconstitutionally vague and lacks a specific intent requirement.  The People respond that neither the section 186.22 substantive offense nor the enhancement require that a defendant know that the people he or she is associating with are gang members.  Additionally, the People contend that to the extent such knowledge was required, there was substantial evidence from which the jury could infer that defendant knew the other participants in the assault were Norteños.

We conclude that the gang enhancement does not require the knowledge element defendant asserts and there is substantial evidence supporting the knowledge element required for the substantive gang offense, active participation in a criminal street gang.

## B.  Analysis

We must first address defendant's argument that both the substantive offense and the enhancement under section 186.22 require that defendant knew that the people with whom he associated were gang members.  The Court of Appeal, Fourth Appellate District, Division One, recently addressed these issues:  "Contrary to defendants'

---

[10]  Section 186.22, subdivision (a), provides in pertinent part:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished."

[11]  Section 186.22, subdivision (b)(1), provides in pertinent part:  "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished."

21

argument on appeal, the enhancements alleged under section 186.22, subdivision (b) do not require a showing that defendants also *knew* they were assisting gang members. Rather, by its terms, the only mens rea required to establish the gang enhancement is proof of an intent to promote, further or assist a crime or crimes committed by gang members. [¶] In this sense, the enhancement set forth in section 186.22, subdivision (b), which requires proof that an underlying crime was related to gang activity and proof of an intent to assist in committing the crime, is to be distinguished from the substantive crime of active gang participation, proscribed by section 186.22, subdivision (a), which by its terms requires *knowledge* by a defendant that he or she has been assisting the criminal conduct of a gang with a pattern of street crime. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 (*Rodriguez*).) [¶] We recognize that in *People v. Albillar* (2010) 51 Cal.4th 47, 54-59 [] (*Albillar*), the court held that under section 186.22, subdivision (a) knowledge that participants in a crime are members of a criminal street gang must be established, but no proof that a particular crime was gang related is required. However, nothing in *Albillar* imports into the separate enhancement set forth in section 186.22, subdivision (b) a scienter or knowledge requirement." (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1362, review den. June 8, 2016, S233223 (*Garcia*).)

We agree with the *Garcia* court. Whereas the substantive crime under gang 186.22, subdivision (a), by its terms, requires that a defendant *know* members in the gang engage in a pattern of criminal gang activity and *willfully* promote, further, or assist the criminal conduct of *members of that gang*, the enhancement under subdivision (b) does not require such knowledge. Rather, the gang enhancement requires "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Indeed, as we have noted, there is no requirement that the defendant be an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1) (*People v. Sanchez, supra*, 63 Cal.4th at p. 698; *People v. Bragg, supra*, 161 Cal.App.4th at p. 1402, citing *In re Ramon T., supra*, 57 Cal.App.4th at

22

p. 207), or for that matter, that every one of the others with whom he participates in the crime also be active members of the gang (*Rodriguez, supra*, 55 Cal.4th at p. 1132 [reasoning that the statute requires only that the "criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member"]). As our high court has clarified, "Section 186.22(a) and section 186.22(b)(1) strike at different things. The enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.] However, '[n]ot every crime committed by gang members is related to a gang.' [Citation.] As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang related."[12] (*Rodriguez*, at p. 1138.)

Even if we disagreed with the *Garcia* court's distinction between the gang enhancement and the gang crime, we would conclude there is sufficient evidence in the record to support the convictions with respect to defendant's knowledge that he was assisting gang members. Indeed, because we agree with defendant and the *Garcia* court that the gang crime, by its own terms, requires such knowledge, we must address defendant's assertion that "the record contains no evidence which would support a conclusion" that defendant knew the other people he assisted in the assault were Norteños.

---

[12] For this reason, we also reject defendant's meritless argument that section 186.22, subdivision (b), violates defendant's right to due process. As our high court clarified, "the STEP Act satisfies the requirements of due process by 'impos[ing] increased criminal penalties only when the criminal conduct is felonious and committed not only "for the benefit of, at the direction of, or in association with" a group that meets the specific statutory conditions of a "criminal street gang," but also with the "specific intent to promote, further, or assist in any criminal conduct by gang members." ([Former] § 186.22, subd. (b)(1).)' [Citation.] We do not understand the due process clause to impose requirements of knowledge or specific intent beyond these, and defendant cites nothing to convince us otherwise." (*People v. Loeun* (1997) 17 Cal.4th 1, 11.)

The record demonstrates that prior to the incident, the Norteños were known to everyone else in B pod, they had begun programming as new Norteños arrived to the pod, and started taking over the pod. Nunez testified that on the day of the assault, the Norteños told his non-affiliated bunkmate "he had to move because they needed that bunk because they wanted to be close to each other" in case something happened. As we have discussed, Nunez had identified defendant in a photographic line-up after the incident as the new guy for whom the Norteños were making bunk space, and after the prosecutor refreshed his memory with his initials on the photographic line-up, Nunez testified that defendant was "the new guy that came in the cell the Norteños were making bunk space for." Serrano-Gomez also identified defendant in a photographic line-up and in court as the new guy who the Norteños made room for in the pod on the day of the fight. The attack occurred shortly after defendant entered the pod, about five to six hours after his booking. There was also testimony from Nunez and Serrano-Gomez that defendant joined in the assaults. Deputy Charter testified that defendant had injuries to his face after the assault and believed that because they pulled out prisoners who had injuries to their hands and defendant was one of those who were pulled out first, that he too had injuries to his hands. Deputy Charter testified that when there is a spontaneous fight between a Norteño and another prisoner, other Norteños are required to jump in and fight or risk being attacked by the Norteños. And defendant had earlier admitted to Deputy Charter that he was a Norteño. Together, this testimony supports the reasonable inferences that defendant was a Norteño, the other participants in the assault knew he was a Norteño and made room for him in the pod (the catalyst for the assault), and defendant knew that they were Norteños as well, which motivated him to join in the assault.

Additionally, Deputy Moore's testimony as an expert further supports these inferences. He opined that the attack was committed for the benefit of *and in association* with the gang, testified that all of the prisoners who took part in the assault, except for the victims, were validated as Norteños, and further opined that defendant was an active gang

24

member at the time of the assault. Additionally, Deputy Moore testified that based on his training and experience, the Norteños would not make room in the pod for a non-Norteño. This testimony also tends to support a reasonable inference under section 186.22, subdivision (a), that defendant knew the other participants in the assault were Norteños. Accordingly, we conclude there was substantial evidence from which the jury could infer that defendant knew the other attackers were Norteños.

### IV. Jury Instructions on Gang Offense and Gang Enhancement

### A. Additional Background and the Parties' Contentions

The trial court instructed the jury on the substantive gang offense (§ 186.22, subd. (a)) with CALCRIM No. 1400 (active participation in a criminal street gang) in pertinent part as follows:

"Defendant is charged in Count III with participating in a criminal street gang in violation of Penal Code section 186.22(a). To prove that the [d]efendant is guilty of this crime, the People must prove that the [d]efendant actively participated in a criminal street gang; when the [d]efendant participated in the gang, he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity; and the [d]efendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by directly and actively committing a felony offense, or aiding and abetting a felony offense. 'Active participation' means involvement with a criminal street gang in a way that is more than passive or in name only."

The trial court further instructed the jury on the gang enhancement with CALCRIM No. 1401 (felony committed for the benefit of criminal street gang) in pertinent part follows: "If you find the [d]efendant guilty of the crimes charged in Counts I and II, you must then decide whether, for each crime, the People have proved the additional allegation that the [d]efendant committed the crime for the benefit of or in association with the criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. To

25

prove this allegation, the People must prove that the [d]efendant committed the crime for the benefit of, or in association with, a criminal street gang; and the [d]efendant intended to assist, further or promote criminal conduct by gang[] members."

In addition to CALCRIM Nos. 1400 and 1401, the trial court instructed the jury with a special instruction, "Special 3." Special 3 instructed as follows: "Commission of a gang crime in concert with known gang members is substantial evidence to support the inference that the [d]efendant acted with a specific intent to promote, further or assist gang members in the commission of the crime."

Defendant contends that the two CALCRIM instructions were deficient because they did not clearly instruct the jury on the knowledge element of the substantive gang participation offense and the purported knowledge element of the gang enhancement. Additionally, defendant contends that the special instruction, designated as " 'Special 3,' " regarding the gang enhancement, was also improper. Defendant contends Special 3 is "at best a tautology" because the instruction essentially said that "commission of a gang crime is substantial evidence that the defendant committed a gang crime."

## B. Analysis

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence, . . . that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) "The trial court must instruct even without request on the general principles of law relevant to and governing the case. [Citation.] That obligation includes instructions on all of the elements of a charged offense." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

As an initial matter, the People contend defendant's appellate claim is forfeited because it was not raised below. We reject this argument. Because defendant challenges the instruction on the ground that it misstated an essential element of the offense, we

26

review his claim on the merits. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [no forfeiture when the trial court gives an instruction that is an incorrect statement of the law related to the elements of a charged offense]; see also *People v. Mason* (2013) 218 Cal.App.4th 818, 823 ["[i]nstructional error as to the elements of an offense is not waived by trial counsel's failure to object"].)

As we discussed *ante*, defendant's knowledge that the other participants in the crime were gang members is not required under the section 186.22, subdivision (b), enhancement. (*Garcia, supra*, 244 Cal.App.4th at p. 1362.) Because we reject defendant's reading of the statute, we also reject his argument that CALCRIM No. 1401 should have required a showing of such knowledge. Accordingly, the court did not err in instructing the jury with CALCRIM No. 1401.

However, as we concluded *ante*, such knowledge is required under the section 186.22, subdivision (a), substantive offense. Defendant contends that the instruction for the substantive offense, CALCRIM No. 1400, was insufficient because it did not clearly express that the defendant "must *know* that those people are members of the gang." Defendant misreads and unduly complicates the instruction. The instruction, closely tracking the statutory language, provided that the People were required to show: "the [d]efendant actively participated in a criminal street gang; when the [d]efendant participated in the gang, he *knew that members of the gang engaged in or have engaged in a pattern* of criminal gang activity; and the [d]efendant *willfully* assisted, furthered or promoted felonious criminal conduct *by members of the gang* either by directly and actively committing a felony offense, or aiding and abetting a felony offense." (Italics added.)[13]

---

[13] This language also closely tracks our Supreme Court's articulation of the elements of section 186.22, subdivision (a), active participation of a criminal street gang. Our high court has written, "the elements of the gang offense are (1) active participation in a

27

It is axiomatic that for a defendant to *willfully* assist members of the gang in which he actively participates and knows the members have engaged in a pattern of criminal activity, he must also know that the "members of the gang" are indeed gang members. In other words, "section 186.22, subdivision (a), [] by its terms requires *knowledge* by a defendant that he or she has been assisting the criminal conduct of a gang with a pattern of street crime." (*Garcia, supra*, 244 Cal.App.4th at p. 1362.) Accordingly, the court did not err in instructing the jury with CALCRIM No. 1400, which closely tracks the language of the statute and the elements listed out by our high court. (See fns. 10 & 13, *ante*.)

However, we agree with defendant that court erred in instructing the jury with the Special 3 instruction. The instruction added nothing to CALCRIM No. 1400, and as written, the instruction was ambiguous. We conclude, however, that any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. " '[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) "[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error." (*People v. Mena* (2012) 54 Cal.4th 146, 162.) Defendant has not met this burden with respect to the Special 3 instruction. As defendant points out in his opening brief, the instruction's tautological wording was both redundant to CALCRIM No. 1400 and likely confusing. However, that does not make the instruction prejudicial under *Watson*.

---

criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*Albillar*, *supra*, 51 Cal.4th at p. 56, citing *People v. Lamas* (2007) 42 Cal.4th 516, 523.)

Defendant further argues that the phrase, "gang crime in concert with known gang members," is ambiguous and misleading because it does not specify whether the " 'known gang members' " must be known as gang members to the defendant or merely to law enforcement. We also note that the instruction uses a term of art, "substantial evidence." As used in *People v. Villalobos* (2006) 145 Cal.App.4th 310, the case from which the language for this instruction came, the term "substantial evidence" described a standard of appellate review for claims of insufficiency of the evidence, not a metric of persuasiveness concerning evidence to be considered by a jury. (*Id*. at pp. 321-322.)[14]

We agree with defendant that this language could be misleading. However, this instruction did not conflict with the more specific CALCRIM Nos. 1400 and 1401, which as we have discussed *ante*, clarified the mens rea required under each respective subsection of section 186.22. We determine the correctness of jury instructions " ' " 'from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964.)

Viewing the instructions as a whole and considering the evidence we have outlined that convincingly established that the charged assaults were gang related and supported the required mens rea elements, we conclude any error in instructing the jury with Special 3 was harmless.

---

[14] The use of the special instruction here serves as an example of the care that must be taken when creating special instructions from the language of appellate opinions. As the drafters of CALCRIM have noted, the reason the CALJIC instructions were "so often impenetrable is that they [were] based on the language of case law and statutes written by and for a specialized legal audience and *expressed in terms of art*." (Judicial Council of Cal., Crim. Jury Instns. (2016) Preface, p. xi, italics added.)

## V.  Prosecutorial Misconduct

### A.  Additional Background and the Parties' Contentions

During closing argument, defense counsel attacked Deputy Charter's credibility, arguing the following:  "In his report with respect to his statement that -- on the stand that [defendant] did have marks on his knuckles at the time [--] when he wrote his report, he didn't.  He knows how to document marks on people.  He documented that [defendant] had one or two marks on his head -- red marks, he said.  We don't know what those are from, but he documented them.  He didn't document that he had had marks on his hands.  He testified now a year and a half, almost two years later than he did. . . .  Do you believe what he documented at the time, or do you believe, two years later almost, what he said?"

The prosecutor responded to defense counsel's argument in rebuttal:  "Charter also told you, hey, this is what we do every time there is a fight.  We pull out the people we think [are] involved. . . .  That's what Charter did.  I always find it a little bit entertaining when the Defense argues that, you know, the cop is lying to you.  He is not telling you the whole truth.  Why?  What does he get out of this?  I mean, think about it for a minute.  The cop is going to come in here and lie to you and *risk* his career and *risk* his pension for what?  Doesn't that kind of beg the question, what kind of public enemy are we dealing with here?  This is a jail fight.  This isn't an act of trying to put a bomb in New York City.  What would be the purpose of coming in here and *risking* your whole career, your whole livelihood?  There is no reason.  That is unreasonable.  Remember, this isn't a television show.  This is real life; okay?" (Italics added.)  Defense counsel did not object.

Defendant contends that the prosecutor engaged in misconduct by relying on facts outside of the record.  Specifically, he contends, "Since the record is devoid of evidence that a Yuba County deputy sheriff risks his job by giving false testimony in court, these comments constituted improper vouching for Charter's veracity."  He contends that his trial counsel's failure to object below constitutes ineffective assistance of counsel.

## B. Forfeiture

" ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] ' "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' " (*People v. Prieto* (2003) 30 Cal.4th 226, 260 (*Prieto*).)

There was no objection at trial to the conduct defendant now complains about on appeal. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; see also *Prieto, supra*, 30 Cal.4th at p. 260.) Defendant has therefore forfeited his claim of error. We grant relief from forfeiture only where objections or admonitions would have been futile or the misconduct's nature was incurable. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record," rather than reciting a "ritual incantation that an exception applies." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Here, defendant makes no effort to establish that one of the exceptions to forfeiture is applicable but instead styles his prosecutorial misconduct argument as an ineffective assistance of counsel claim. Accordingly, we decline to grant relief from forfeiture.

## C. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 695-696] (*Strickland*);

31

*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)  The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.  [Citation.]  . . .  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.]  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (*Richter*, at p. 105.)  Regarding defense counsel's performance, our high court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established.  " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)  "When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the

jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184-185 (*Booker*).)

Here, we cannot conclude that defense counsel's performance was deficient in failing to object to the prosecutor's comments. The prosecutor responded to defense counsel's attack on Deputy Charter's credibility by discussing two *risks* to a peace officer associated with committing perjury, at least one of which is common knowledge.

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] . . . [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye* (1998) 18 Cal.4th 894, 971.) " 'It is also clear that counsel during summation may state matters not in evidence, but which are *common knowledge* or are illustrations drawn from common experience, history or literature.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567, italics added.) While defendant contends the record contains no evidence that Deputy Charter could have lost his job if he perjured himself and the prosecutor thus asserted a fact outside the record, in our view, the prosecutor's comments mostly drew on common experience in arguing the deputy had no vested interest or motive to lie when he testified. (See Evid. Code, § 780, subd. (f) [in determining witness credibility, a jury may consider "[t]he existence or nonexistence of a bias, interest, or other motive"].)

We first note, that the prosecutor did not argue that the deputy would have lost his job or been fired as a result of committing perjury. The prosecutor argued that by committing perjury, the deputy *risked* his career and *risked* his pension. The jury was certainly aware that perjury is a crime, and if convicted of such a crime, it is within common knowledge and experience that a *possible consequence* is losing one's job. In

33

rebuttal to defense counsel's argument that Deputy Charter lied in court about defendant's knuckles showing signs of fighting because he did not document it at the time, the prosecutor asked the jury to weigh Deputy Charter's credibility in light of what he could potentially lose if he perjured himself and whether this particular case was worth such a risk given the nature of this case. Essentially, the prosecutor mostly drew on common knowledge and experience about the seriousness of perjury in making this argument. However, we are of the view that it is not necessarily common knowledge the deputy risked losing his pension by committing perjury. Nevertheless, the prosecutor's argument was neither deceptive; nor was it reprehensible. (*Hill, supra*, 17 Cal.4th at p. 819.) Trial counsel is not required to advance meritless objections (*People v. Thomas* (1992) 2 Cal.4th 489, 531; *People v. Jones* (1979) 96 Cal.App.3d 820, 827) and as a consequence, defense counsel need not have objected to the part of the prosecutor's argument about the risk to the deputy's career.

However, because the comment relating to the risk to the deputy's pension is likely not common knowledge, that comment was objectionable. But defense counsel could have made the tactical decision not to object to avoid calling attention to the rest of the comment, since *if* the court sustained the objection, the prosecutor could have simply resumed argument by reasserting the risk to the deputy's career and/or asserting the evidence showed no motive for the deputy to lie. (Evid. Code, § 780, subd. (f); CALCRIM No. 226.) Accordingly, defense counsel's performance did not fall below an objective standard of reasonableness under the *Strickland* test.

Furthermore, even if counsel's performance was deficient, defendant has not established prejudice. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at

34

pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "The likelihood of a different result must be substantial, not just conceivable." (*Richter*, at p. 112.)

In our view, there is not a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. (*Booker, supra*, 51 Cal.4th at pp. 184-185.) Moreover, the evidence we have discussed establishing defendant's complicity in these gang-related assaults is compelling. Defendant has not shown a reasonable probability that he would have received a more favorable result had counsel objected to the prosecutor's comments and the court sustained that objection.

We conclude that defendant has failed to establish he received constitutionally ineffective assistance of counsel.

## VI. Section 654

Our review of the record reveals a sentencing error related to count 3, active participation in a criminal street gang. In imposing sentencing on that count, the trial court stated, "And as to Count III, I'm going to impose the eight months there, which is the mid-term, but stay that as stipulated."[15] The abstract shows the stay, but no sentence is indicated.

Section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

---

[15] In the prosecution's original sentencing memorandum, the prosecution recommended that the trial court impose one-third the midterm and stay that sentence pursuant to section 654 on count 3. The prosecution cited no authority for imposing one-third the midterm. In a supplemental sentencing memorandum, written after the trial court requested briefing on two sentencing issues, including the application of section 654 to the sentence on count 3, the prosecutor stipulated that section 654 applied to count 3.

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

It is well settled that when a court determines that a conviction is subject to section 654, it must *impose* a sentence and then stay the *execution* of the duplicative sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed.  (*People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Alford, supra*, 180 Cal.App.4th at p. 1469 (*Alford*); *People v. Salazar* (1987) 194 Cal.App.3d 634, 640 (*Salazar*); *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756.)  "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned."  (*Salazar*, at p. 640.)

The stayed sentence must be a full-term sentence, not one-third the midterm.  This principle was discussed in *People v. Cantrell* (2009) 175 Cal.App.4th 1161.  "The one-third-the-midterm rule of section 1170.1, subdivision (a),[16] only applies to a consecutive sentence, not a sentence stayed under section 654."  (*Cantrell*, at p. 1164.)  Because the sentence is not imposed consecutively, there is no subordinate term and thus the sentence imposed on the count subject to section 654 should not be one-third the midterm.

---

**16**  Section 1170.1, subdivision (a), provides in pertinent part:  "Except as otherwise provided by law, *and subject to Section 654*, when any person is convicted of two or more felonies, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same or by a different court, and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions, prior prison terms, and Section 12022.1.  The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements.  *The subordinate term for each consecutive offense shall consist of one-third of the middle term* of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed."  (Italics added.)

Further, as we have noted, the reason for staying execution of the sentence is to "ensure[] that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*Salazar, supra*, 194 Cal.App.3d at p. 640; accord, *Cantrell*, at p. 1164 [the stayed sentence would only operate if the principle count were eliminated].) If the rule were that one-third the midterm should be stayed and the principle term is somehow later reversed, the only remaining sentence would be the one-third the midterm sentence.[17]

The trial court imposed an unauthorized sentence by failing to impose a full term sentence on count 3 and stay execution of that sentence. Because the sentence is unauthorized, it may be corrected at any time. (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13 [it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence, including a misapplication of section 654, at any time].)

In *Alford*, this court concluded that the "futility and expense" of remand militated against sending the case back to the trial court for resentencing where this court could determine the sentence that the trial court, in the exercise of its discretion, "undoubtedly" would have imposed. (*Alford*, *supra*, 180 Cal.App.4th at p. 1473.) Here, we conclude the trial court would have undoubtedly imposed the midterm. In imposing the midterm on count 2, the court found that the "aggravating and mitigating factors are in balance."

---

[17] We are aware that in the disposition part of *People v. Mesa* (2012) 54 Cal.4th 191, 201, our high court ordered stays for eight month, one-third the midterm sentences on two section 186.22, subdivision (a), convictions originally imposed consecutively by the trial court. However, the entire focus in *Mesa* was whether sentences on the active participation counts were subject to section 654. The opinion contains no discussion about the propriety of staying execution of the one-third the midterm sentences imposed by the trial court instead of ordering stays on full-term sentences. The *Mesa* court did not discuss the well-settled law we have discussed above. Because cases are not authority for propositions not considered (*People v. Brown* (2012) 54 Cal.4th 314, 330; *People v. Watkins* (2009) 170 Cal.App.4th 1403, 1409), we adhere to the precedent we discuss above.

37

Consequently, we modify defendant's sentence on count 3 to impose the midterm of two years and order that execution of that sentence be stayed pursuant to section 654.

## DISPOSITION

We modify the sentence on count 3, active participation in a criminal street gang, to impose the midterm sentence of two years, and order execution of that sentence stayed pursuant to section 654. The trial court shall amend the abstract of judgment to reflect this modification and send a certified copy of the amended abstract to the California Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.


      MURRAY      , J.


I concur:


     NICHOLSON    , Acting P. J.

DUARTE, J.

I concur in the judgment.  I concur in the opinion, except Part I.B.2., the analysis of prejudice and its conclusion.  Because I agree with the conclusion reached in Part I.B.1. of the Discussion--that the trial *did not err* in admitting defendant's gang affiliation statements during booking--I see no need to continue with a separate analysis of prejudice based on hypothetical error, and will refrain from doing so here.

       DUARTE       , J.

1